ROSEE TORRES, Indiv. and d/b/a Legal Secretarial Services, Ltd., Plaintiff-Appellant, v. THE CITY OF CHICAGO, Defendant-Appellee.

First District (2nd Division)   No. 1—91—1996

Opinion filed March 16, 1994.—Rehearing denied April 28, 1994.

Gregory La Papa, of Chicago, for appellant.

Kelly R. Welsh, Corporation Counsel, of Chicago (Lawrence Rosenthal, Benna Ruth Solomon, and Jean Dobrer, Assistant Corporation Counsel, of counsel), for appellee.

JUSTICE McCORMICK delivered the opinion of the court:

Rosee Torres sued the City of Chicago (the City) for breach of contract. The trial court granted the City summary judgment and Torres appeals.

We find that the document appended to the complaint was only an invitation for orders, not a contract, when the parties signed it. The document established the terms of the contract which became effective when the City actually ordered services from Torres. Since the documentary evidence showed that the City fully performed its obligations under the contract, we affirm the decision granting the City summary judgment.

On June 4, 1984, the City sent Torres, doing business as Legal Secretarial Services, Ltd. (LSS), a letter asking Torres to tell the City LSS's rates for telephone switchboard operators, and asking how many bilingual and single-language operators were available through LSS. Following further correspondence, Torres sent 20 operators to interview for the available positions on September 3, 1984. The City chose four of the operators from LSS. Torres billed the City for their services and the City paid the bills. On November 6, 1984, the four operators all resigned their positions with LSS and became employees of other temporary employment agencies. The four operators continued working for the City, and the City paid their new employment agencies for their services. In February 1985 the City canceled its request for temporary operators.

Torres sued the City in Federal court for violation of 42 U.S.C. § 1981 (1988) and for breach of contract. The Federal court granted the City judgment on the pleadings on the section 1981 claim, and it chose not to exercise pendent jurisdiction over the breach of contract claim, so it dismissed that claim without prejudice. Torres then sued the City in State court for breach of contract.

Torres alleged in her Federal complaint that around June 4, 1984, the City sent letters similar to the one it sent Torres to nine other temporary employment agencies, asking for rates and availability of switchboard operators. On July 25, 1984, after receiving responses from several agencies, the City sent LSS and four other agencies the form at issue here, requesting operators to work for the City, as needed, between July and December 1984. The form provided:

"DELIVERY DATE
AS REQ'D
AMOUNT
DEPENDS ON REQUIREMENT
* * *

The rates are as follows:

| 1-4 Operators | 5-9 Operators | 10+ Operators |
|---|---|---|
| $8.15/hr | $7.96/hr | $7.84/hr |

* * *

Contractor is to be responsible for maintaining any fringe benefits, FICA, Worker's Compensation taxes, insurance separation pay, unemployment claims, etc.
* * *

FUND / DEPT.
SEE BELOW
* * *

Number of operators available __10+    10
Number of bilinguals available __10+    10

| FD 4404 | 100-4221-149 | $10,000.00 |
|---|---|---|
| PD 653 | 100-4122-149 | 30,000.00 |
| PWAD 4206 | 100-6211-144 | 6,000.00 |
| AVOH 743 | 740-8687-157 | 14,000.00 |
| SSR 417 | 100-5311-128 | 15,000.00 |
| WS 26 | 200-8351-1200 | 7,000.00 |

***

TERMINATION
This contract can be terminated upon a written notice by the Purchasing Agent if there is no further need for the requirement, or if sufficient funds have not been appropriated to cover the estimated requirements."

Torres indicated her agreement to the terms set forth by signing the form and returning it to the City. The other agencies signed similar agreements and provided some of the operators the City needed.

Torres alleged in her verified State complaint that on November 6, 1984, Francisco DuPrey, who then worked in the mayor's office of inquiry and information, called Torres and told her the City canceled its contract with her because LSS did not qualify as a minority busi-

ness and because she failed to make requested political contributions. Torres alleged that the City reinstated her contract on December 18, 1984, and extended it to cover the term from January 1 until June 30, 1985. She supported this allegation with a form she received from the City which stated that the July 25, 1984, agreement

> "heretofore issued *** has been *** duly amended. All parties will apply the change as indicated below:
> ***
> Please *** (alter) as ***:
> Extend contract period to June 30, 1985."

Torres sent 20 more switchboard operators to interview with the City in January 1985, but the City did not hire any of them. On February 25, 1985, the City sent Torres a copy of a memorandum from DuPrey to the head of the City's purchasing department

> "requesting that [the City] terminate all contract extensions regarding temporary operator service.
> The *** numbers for the contracts begin at # 3751 and continue through # 3759 and 3783."

These are the numbers of all the agreements for temporary operator service with all of the temporary employment agencies. Torres alleged that her reinstated contract was again canceled in February 1985 because LSS did not qualify as a minority business and because she refused to make political contributions to the mayor.

Torres and the City moved for summary judgment, and Torres supported her motion with her affidavit, various letters and the deposition of DuPrey. DuPrey testified that the mayor's office of inquiry and information sought 13 to 15 temporary operators in June 1984 to help the understaffed department. The office took telephone calls for a number of city departments and routed the calls to the proper departments. The office requested budget assistance to hire the temporary operators from the city departments whose calls most frequently came through the office. The office expected to spend about $85,000 on the necessary temporary personnel. Six separate departments agreed to contribute funds needed to hire the temporary operators. DuPrey explained that the amounts listed in the agreement showed the various department funds and the amounts each department contributed to the office's total need. Thus, the Chicago fire department (FD) contributed $10,000, the Chicago police department (PD) contributed $30,000, public works (PWAD) contributed $6,000, and so forth. The sums shown total only $82,000. The office of inquiry and information obtained the final $3,000 of the projected need from the Department of Health, although that amount is not shown on the form.

DuPrey testified that he personally interviewed all of the

candidates from all of the temporary agencies and chose the ones hired. DuPrey explained that the City terminated the contracts with the temporary agencies on February 5, 1985, because it had funds to hire permanent, full-time personnel as operators.

Torres states in her brief on appeal that this court has jurisdiction pursuant to Supreme Court Rule 304. (134 Ill. 2d R. 304.) The trial court granted the City summary judgment on both counts of the complaint, and Torres and the City are the only parties to the suit. Therefore, the trial court has entered final judgment on the lawsuit, and this court has jurisdiction under Supreme Court Rule 301. 134 Ill. 2d R. 301.

The court should grant summary judgment only if the pleadings and evidence raise no triable issue of material fact and the movant is clearly entitled to judgment. (*Chicago Title & Trust Co. v. Baskin Clothing Co.* (1991), 219 Ill. App. 3d 726, 731, 579 N.E.2d 1045.) Since the construction of a contract is generally a question of law for the court to decide (*Berkeley Properties, Inc. v. Balcor Pension Investors II* (1992), 227 Ill. App. 3d 992, 998, 592 N.E.2d 63), summary judgment is appropriate when the meaning of a contract is the sole determinative issue in a case. (*Chicago Title & Trust,* 219 Ill. App. 3d at 731; *Village of Rosemont v. Lentin Lumber Co.* (1986), 144 Ill. App. 3d 651, 659, 494 N.E.2d 592.) The court should determine the meaning of a contract from the language the parties used therein. (*Michigan Avenue National Bank v. Evans, Inc.* (1988), 176 Ill. App. 3d 1047, 1054-55, 531 N.E.2d 872.) Only if that language is ambiguous should the court consider extrinsic evidence concerning the intentions of the parties. *Wald v. Chicago Shippers Association* (1988), 175 Ill. App. 3d 607, 618, 529 N.E.2d 1138.

The form which the parties call a contract here asks LSS to supply telephone operators for the period from July 1 to December 31, 1984, but the number of operators, as well as the dates on which they are to work, expressly "DEPENDS ON REQUIREMENT." The City stated the rates it agreed to pay on the face of the contract, with the rates varying depending on the number of operators from the agency the City hired. The City expressly required the agencies to pay all taxes and fringe benefits. The form asks LSS to make available 20 operators, but it includes no promise to accept all 20. The variable rates depending on the number of operators indicate an intention not to promise to hire any specific number. The City expressly reserved the right to terminate the agreement "if there is no further need."

Torres claims that the City promised to pay her the sum of the dollar amounts shown on the form, for a total of $82,000. Torres contends that the dependence on requirement shows that the form is

a requirements contract, which became a binding and enforceable promise to pay $82,000 when she returned a signed copy to the City.

Because the form is not perfectly clear about many of its terms, and it includes considerable language which the court cannot interpret based solely on the face of the form, the trial court here properly considered extrinsic evidence concerning the meaning of the document. As our supreme court noted, such evidence is often appropriate for requirements contracts:

"[T]he word 'required' has so many and such different meanings that a court would be justified, when a controversy arises as to the meaning given the word by the parties to the contract at the time the contract was signed, in admitting proof of the circumstances surrounding the parties and the object they had in view at the time the contract was made. [Citation.] Sometimes the word 'require' is used in the sense of 'need,' and sometimes it is used in the sense of 'ask' or 'want' or 'order,' and for that reason a contract using the word might be rendered ambiguous." *Armstrong Paint & Varnish Works v. Continental Can Co.* (1921), 301 Ill. 102, 107, 133 N.E. 711.

In *Armstrong* a paint manufacturer agreed to purchase from a can company "a minimum of $2,000 worth of tin packages or more, as required by *** buyers." (*Armstrong*, 301 Ill. at 104.) The court held:

"It was therefore proper for the [trial] court to hear evidence to the effect that the paint company had not theretofore bought cans from the can company, that the paint company had contracts with other can companies that had not yet expired and that the can company knew this, and any other facts showing the situation of the parties, so that the court might determine in what sense the word 'required' was used by them. *** As we view the language used in this contract, it clearly means that the paint company unconditionally obligated itself to buy a minimum of $2000 worth of tin packages from the can company and that it was given the privilege or option of buying more packages if required for actual use in its business." *Armstrong*, 301 Ill. at 107-08.

Here, too, the extrinsic evidence of the admissions Torres made in her Federal complaint, along with DuPrey's deposition testimony, established that the City had nearly identical dealings with several other temporary employment agencies, and all understood that the City would choose as many operators as it needed from those the agencies made available. On the form the City makes no promise to meet all of its requirements from any one agency, and the prior course of dealing implies no such promise.

■ "[A]n essential element of a requirements contract is the promise of the buyer to purchase exclusively from the seller either

the buyer's entire requirements or up to a specified amount." (*Mid-South Packers, Inc. v. Shoney's, Inc.* (5th Cir. 1985), 761 F.2d 1117, 1120.) Without exclusivity, the buyer in a requirements contract has effectively promised nothing of value to the seller: "The promise [in a requirements contract] contains one very definite element that specifically limits the promisor's future liberty of action; he definitely promises that he will buy of no one else." (1A A. Corbin, Corbin on Contracts § 156, at 33 (1963).)

> "In the absence of such a promise, or some other form of consideration flowing from the buyer to the seller, the requisite mutuality and consideration for a requirements contract is absent. [Citations.] The promise of the seller becomes merely an invitation for orders and a contract is not consummated until an order for a specific amount is made by the buyer." *Propane Industrial, Inc. v. General Motors Corp.* (W.D. Mo. 1977), 429 F. Supp. 214, 219.

See Restatement (Second) of Contracts § 77, Comment b (1981).

With contracts similar to that at issue here, courts have followed the analysis in *Propane Industrial.* In *Loizeaux Builders Supply Co. v. Donald B. Ludwig Co.* (1976), 144 N.J. Super. 556, 366 A.2d 721, the contract imposed on the defendant

> "no obligation to deal exclusively with plaintiff but rather stated that if a supplier at a lower price had come to his attention, he could have dealt with it instead of plaintiff. [Plaintiff] agreed that defendant could have bought its supply of concrete elsewhere. Accordingly, the relationship between the parties is best character-ized as a series of separate contracts, with the added element that several of the contract terms related back to the parties' original agreement." *Loizeaux,* 144 N.J. Super. at 560, 366 A.2d at 724.

See also *Billings Cottonseed, Inc. v. Albany Oil Mill, Inc.* (1985), 173 Ga. App. 825, 328 S.E.2d 426.

■ The form here, when Torres signed it and returned it to the City, could not constitute a requirements contract because the City reserved the right to obtain temporary operators from other agencies. And, unlike the contract in *Armstrong,* the City did not promise to buy any minimum amount of services from any one agency. Therefore, the form was merely Torres' invitation for orders, which did not become a contract until the City ordered a specific amount of services. When the City accepted four persons LSS sent to it as temporary operators, the parties had an effective contract for the ser-vices of the four operators, for as long as LSS provided their services to meet the City's needs, under the terms set forth in the signed agreement.

Other documents presented to the court showed that the City made the payments to LSS required by the contract for the work of

those four operators for the time that they remained employees of LSS. Torres conceded that she received such payments, but she contends that she was entitled to the $82,000 indicated on page two of the form as her agency fee. While the contract includes the numbers which total to $82,000, it has no language promising to pay LSS that amount. DuPrey explained, with supporting documents from the various city departments involved, that those numbers indicated the amounts the corresponding departments agreed to contribute for the 10 to 15 temporary operators DuPrey expected to hire from all of the employment agencies contacted. The evidence contradicts Torres' proposed interpretation of the City's contractual commitment.

Torres presented documents showing that when the four operators from her agency who worked for the City quit her agency, they began working for other agencies and continued in their positions with the City. The trial court noted its surprise that the operators could do so without violating their employment contracts with LSS, but as the court noted, the surprising change did not in any way violate the terms of the City's contract with LSS. Nothing in the form or any other evidence Torres presented shows any agreement by the City not to keep LSS employees on after they quit working for LSS, and nothing shows any agreement by the City to continue paying Torres for operators who are no longer supplied through LSS. The City's failure to make any payments to Torres for work by the four operators after November 6, 1984, does not constitute a breach of contract.

After November 6, 1984, the City did not accept the services of anyone employed by LSS, and the contract with LSS did not require it to do so. The contract for the services of those four operators was at an end; the signed agreement remained in effect as Torres' invitation for orders, setting forth the terms for any subsequent contract between the parties if the City had, prior to December 31, 1984, ordered services of any operators employed by LSS. No acts of the City after November 6, 1984, could breach the contract with LSS, since the City had no contract with LSS after that date. In particular, the City's cancellation of the agreement in February 1985 cannot constitute breach of contract since Torres had no contract with the City at that time. She only had outstanding an invitation for orders, which the City had declined.

Torres claims that the City's acts on November 6, 1984, amounted to a breach of contract. Torres admits that the City paid her at the rates shown per operator on the face of the contract for all of the work LSS employees performed for the City on or before November

6, 1984. She argues that by canceling the agreement without cause on November 6, 1984, the City breached the contract. She alleged in her complaint that the City reinstated the contract on December 18, 1984, and extended it to cover the period from January 1 until June 30, 1985. The document she presented in support of this allegation contains no language of reinstatement, and she presented no other evidence of a new contract effective on December 18, 1984. The form she presented showed only an extension of the prior agreement, which was only an invitation for orders. Since she sued in count II of her complaint for breach of the reinstated contract, she needed to append an exhibit showing the reinstatement or plead facts showing that such a document was unavailable. (Ill. Rev. Stat. 1991, ch. 110, par. 2—606.) She did neither.

Since the evidence shows no reinstatement, but only an extension of the invitation for orders, the evidence leads to the conclusion that the City never canceled the original agreement. "Where there is a conflict or discrepancy between the pleaded facts and facts set forth in attached exhibits, the exhibits are controlling." (*Groenings v. City of St. Charles* (1991), 215 Ill. App. 3d 295, 312, 574 N.E.2d 1316.) Here the allegation of cancellation conflicts with the document of a later date showing an extension, without any documentation of reinstatement, and without explanation of the absence of such documentation. Moreover, all that Torres has alleged is cancellation of an agreement which set the terms for any orders for services the City might choose to place with LSS. The alleged cancellation amounts to no more than the City's decision not to place orders with LSS, and in the agreement the City reserved the right to make just that decision.

Since Torres presented no evidence which could support a finding that the City breached the agreement dated July 25, 1984, the contract which began when the City ordered services of four specific employees of LSS, or the extension of the agreement, the trial court properly granted summary judgment on both counts of the complaint in favor of the City.

Affirmed.

HARTMAN and SCARIANO, JJ., concur.