ECHO, INCORPORATED, an Illinois
corporation, Plaintiff–Appellee,

v.

WHITSON COMPANY, INCORPORAT-
ED, doing business as Power Tool
Company, Defendant–Appellant.

No. 96–1970.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 11, 1997.

Decided Aug. 4, 1997.

Gary D. Santella, Susan M. Rentschler (argued), Masuda, Funai, Eifert & Mitchell, Chicago, IL, for plaintiff–appellee.

Michael T. Reid (argued), Halfpenny, Hahn, Roche & Marchese, Chicago, IL, for defendant–appellant.

Before COFFEY, MANION, and KANNE, Circuit Judges.

KANNE, Circuit Judge.

In 1988, Power Tool Company (PTC) in Johnson City, Tennessee became a distributor for Echo, Inc., which manufactures outdoor portable power equipment. In 1992, however, the relationship went sour, and Echo terminated the distributorship agreement. Echo sued PTC to collect money still owed from equipment purchases, and PTC filed counterclaims based on alleged breaches by Echo. The District Court granted summary judgment for Echo on its claim, and we affirmed. *ECHO, Inc. v. Whitson Co.*, 52 F.3d 702 (7th Cir.1995) (*Echo I*). The case now comes back to us for review of the District Court's resolution of PTC's counterclaims. The District Court granted summary judgment for Echo on one of PTC's counterclaims, dismissed two of the counterclaims for failure to state a claim, and entered judgment for PTC on the last counterclaim pursuant to an accepted offer of judgment under Federal Rule of Civil Procedure 68. PTC now appeals.

## I. HISTORY

Three documents tell much of the story of this case. The first document is the distributorship agreement entered into by Echo and PTC in 1988. The second is a preseason purchase order that PTC made for equipment it would need for the 1993 selling season. We will refer to this document as the Spring Order. In August 1992, Echo's regional sales manager and PTC's president negotiated and signed the Spring Order, which requested Echo to deliver the equipment in installments over the period between December 1992 and July 1993. The third document is an October 15, 1992 letter to PTC from Echo's supervisor of customer service. The letter is addressed generically "To All Distributors" and mentions three enclosed computer reports "recapping your 1993 Spring Booking of Units and Accessories." The letter states that the computer reports should be helpful "when reconciling your order" and that "[i]t is extremely important to verify that the information on these reports matches your records" because "mis-takes and omissions can sometimes occur" when entering the orders into the computer.

Despite this correspondence, Echo never shipped the goods PTC requested in the Spring Order. On October 30, 1992, PTC's account with Echo showed $241 of charges more than 30 days overdue. By November 30, however, PTC's account had an overdue balance of $131,218. In between these two dates, on November 17, Echo gave PTC a letter terminating PTC as a distributor, effective in 60 days. The letter states that PTC was being terminated based on

lack of sales performance, the reduction in the size of your company by giving up a major line, the reduction of your sales staff (which will have a negative impact on ECHO penetration in the marketplace), the reduction in service training in the marketplace (which impacts dealer product knowledge) and the change in Power Tool's ability to adequately acquire financing to support the line without putting an undue burden on ECHO, INCORPORATED.

PTC did not take kindly to Echo's termination, telling Echo in a November 25 letter that PTC would treat any such termination as a breach of contract. Echo responded with a letter on December 1 reaffirming its intention to terminate the distributorship, and PTC responded with a December 4 letter threatening legal action. To avoid litigation, Echo reversed the termination. PTC never learned of the reversal, however, because Echo failed to communicate the news to PTC—a failure Echo claims was an inadvertent mistake. In December 1992, therefore, PTC was under the impression that it would no longer be a distributor when the termination took effect in January 1993.

As for PTC's outstanding balances and purchase orders, PTC's account was $216,000 overdue by December 1, 1992. PTC's Spring Order had requested the goods to start arriving during that December, but Echo advised PTC in a December 10 letter that it would deliver goods only on a C.O.D. basis because PTC's account was so delinquent. After that letter, PTC apparently neither asked that the Spring Order be delivered C.O.D. nor even inquired to Echo about the Spring Order.

By March 1, 1993, PTC had an overdue balance of $222,000, some of which was more than 90 days overdue. On March 3, Echo gave PTC written notice that it was terminating PTC based on paragraph 8.2(C)(xi) of the distributorship agreement, which authorizes immediate termination "if Distributor becomes more than ninety (90) days in arrears in payment of its account." By June 1993, Echo and PTC were in court, and PTC filed the counterclaims we must consider here.

## II. ANALYSIS

### A. Breach of Contract—Spring Order

 PTC's first counterclaim alleges that Echo breached a contract based on PTC's Spring Order. More specifically, PTC contends that the Spring Order was an offer that Echo accepted either 1) when Echo's regional sales manager signed the order, or 2) when Echo sent PTC the recap of the order. The District Court denied PTC's motion for summary judgment on this counterclaim and instead granted summary judgment for Echo, finding that Echo never accepted the offer. Under Illinois law,[1] when the basic facts are not in dispute, the existence of a contract is a question of law. *Cottingham v. National Mut. Church Ins. Co.*, 290 Ill. 26, 124 N.E. 822, 825 (1919); *Lewis-Connelly v. Board of Educ. of Deerfield Pub. Sch., Dist. 109*, 277 Ill.App.3d 554, 214 Ill.Dec. 92, 94, 660 N.E.2d 283, 285 (1996); *Yorke v. B.F. Goodrich, Co.*, 130 Ill. App.3d 220, 85 Ill.Dec. 606, 608, 474 N.E.2d 20, 22 (1985). Issues of contract formation are therefore particularly well-suited for disposition on summary judgment, and we review the District Court's grant of summary judgment *de novo, see Malcak v. Westchester Park Dist.*, 754 F.2d 239, 243 (7th Cir.1985).

 PTC first argues that the signature of Echo's sales manager on the Spring Order constitutes an acceptance of PTC's offer. In its simplest form, this argument must lose because paragraph 5.3 of the distributorship agreement provides, "All orders for Products shall be subject to acceptance by [Echo] at Lake Zurich, Illinois" where its headquarters were located. PTC therefore embellishes its argument, suggesting that Echo waived this express provision of the agreement by sending its sales manager to negotiate and sign the Spring Order.

 Contrary to PTC's suggestion, however, we find no indication of waiver by Echo. This transaction is governed by the UCC because the predominant purpose was the sale of goods, *see Yorke*, 85 Ill.Dec. 606, 474 N.E.2d at 22. Section 1–205 of the UCC states that the express terms of an agreement and an applicable course of dealing between parties "shall be construed wherever reasonable as consistent with each other," 810 Ill. Comp. Stat. 5/1–205(4). We find that Echo's practice of sending sales managers out to negotiate with distributors is plainly consistent with the distributorship agreement—Echo was merely soliciting offers that subsequently could be accepted in Lake Zurich. Moreover, § 2–105 states that if an express agreement and course of dealing cannot be reasonably construed as consistent, then the express terms control over the course of dealing. *See* 810 Ill. Comp. Stat. 5/1205(4). Thus, even if Echo's practice of sending out sales managers was inconsistent with the distributorship agreement, the UCC mandates that the express agreement trumps the course of dealing. This conclusion is reinforced by Illinois cases where courts, faced with purchase orders containing specific provisions regarding a seller's acceptance, have been reluctant to find contractual obligation based on other conduct by the seller. *See Beard Implement Co. v. Krusa*, 208 Ill. App.3d 953, 153 Ill.Dec. 387, 391, 567 N.E.2d 345, 350 (1991) (no contract formed where purchase order unambiguously required seller's signature for acceptance); *Zinni v. Royal LincolnMercury, Inc.*, 84 Ill.App.3d 1093, 40 Ill.Dec. 511, 513, 406 N.E.2d 212, 214

1. Both parties assume that Illinois law governs this diversity case, and as we did in the prior appeal, we will apply Illinois law. *See ECHO I*, 52 F.3d at 707. A state's highest court is the "final arbiter of what is state law," *West v. American Tel. & Tel. Co.*, 311 U.S. 223, 236, 61 S.Ct.

179, 183, 85 L.Ed. 139 (1940), but the decisions of intermediate appellate state courts are data for ascertaining state law which we may not disregard unless we are "convinced by other persuasive data that the highest court of the state would decide otherwise." *Id.* at 237, 61 S.Ct. at 183.

(1980) ("Where an order form containing the buyer's offer, requires the acceptance of the seller, no contract will exist until the seller has manifested acceptance of the offer."). In short, no contract was yet formed when Echo's sales manager signed the Spring Order.

PTC's fallback argument is that Echo's October 15, 1992 letter signaled Echo's acceptance of the Spring Order. The letter, after all, did come from Lake Zurich and would be a logical medium by which to accept PTC's offer. In support of PTC's provision are UCC provisions stating that "an offer to make a contract shall be construed as inviting acceptance in any manner and by any medium reasonable in the circumstances," 810 Ill. Comp. Stat. 5/2–206(1)(a), and that an "agreement sufficient to constitute a contract for sale may be found even though the moment of its making is undetermined," 810 Ill. Comp. Stat. 5/2–204(2). Nonetheless, the UCC retains the basic common law requirements of offer, acceptance, and consideration. Even though the "modes of a valid acceptance may be varied, the requirement of an acceptance by the offeror still exists." *Zinni*, 40 Ill.Dec. at 513, 406 N.E.2d at 214.

In this case, we cannot say that the letter sent by Echo was an objective manifestation of acceptance that could create a contract. The language of the letter does not use the vocabulary of acceptance. The letter, for example, describes attached computer reports as "recapping"—not accepting—the Spring Order. The letter mentions the need for "reconciling" and "verify[ing]" PTC's order to ensure that no mistakes were made when entering the order in Echo's computer. The letter thus reveals a clarification purpose rather than any commitment to provide the goods PTC requested. Indeed, the customer service supervisor who authored the letter stated in a deposition that purchase orders receive only minimal review at Echo's headquarters before being sent for data processing. *Cf. Foremost Pro Color, Inc. v. Eastman Kodak Co.*, 703 F.2d 534, 539 (9th Cir. 1983) (seller's logging of purchase orders as "received" did not manifest acceptance); *Corinthian Pharm. Sys., Inc. v. Lederle*

*Lab.*, 724 F.Supp. 605, 610 (S.D.Ind.1989) (seller's automated, ministerial act such as assigning tracking number to buyer's order cannot constitute acceptance); *Southern Spindle and Flyer Co. v. Milliken & Co.*, 53 N.C.App. 785, 281 S.E.2d 734, 736 (1981) ("Mere acknowledgment of receipt of the purchase order form did not constitute assent to its terms.").

PTC argues, however, that even a "confirmation" can operate as an acceptance. PTC cites the UCC's "battle of the forms" provision, which states that "[a] definite and seasonable expression of acceptance *or a written confirmation* which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon." 810 Ill. Comp. Stat. 5/2–207(1) (emphasis added). PTC reasons that because "confirmation" must mean something other than ordinary acceptance, it must encompass a confirmation of a mere offer (like the recap letter here). As *Album Graphics, Inc. v. Beatrice Foods Co.*, 87 Ill.App.3d 338, 42 Ill.Dec. 332, 408 N.E.2d 1041 (1980), makes clear, however, "confirmation" as used in the UCC refers to confirmation of *a prior agreement*. *Id.* at 338, 408 N.E.2d at 1047 ("The general purpose of section 2–207 is to allow parties to enforce their agreement, whatever it may be, despite discrepancies between an oral agreement and a written confirmation . . . ."); *see also* 810 Ill. Comp. Stat. 5/2–207, Uniform Commercial Code Comment 1 (Smith–Hurd 1993); *Advance Concrete Forms, Inc. v. McCann Constr. Specialties Co.*, 916 F.2d 412, 415 (7th Cir.1990). To quote one UCC commentator, "A confirmation differs from an acceptance in that if it is a true confirmation, a contract between the parties already exists." Harold Greenberg, *Rights and Remedies Under U.C.C. Article 2* § 7.11 (1987).

But if a contract already exists prior to the written confirmation, how can the confirmation operate "as an acceptance" as the UCC suggests? What the UCC must mean here is that the confirmation makes the agreement legally enforceable. The UCC's Statute of Frauds provision requires a writing for contracts involving goods worth $500 or more.

*See* 810 Ill. Comp. Stat. 5/2201(1). Section 2–207(1) therefore allows a written confirmation to turn an oral or informal agreement into a legally-binding contract based on the terms already agreed upon, even if the confirmation includes additional or different terms. As the Fifth Circuit has stated:

> The written confirmation is recognized primarily as a writing necessary to satisfy the statute of frauds when the agreement reached is at least partially unenforceable for lack of a writing; this appears to be the primary basis for permitting a written confirmation to act as an acceptance under [section 2–207 of the UCC].

*Mid–South Packers, Inc. v. Shoney's, Inc.,* 761 F.2d 1117, 1123 (5th Cir.1985); *see also Reaction Molding Techs., Inc. v. General Electric Co.,* 585 F.Supp. 1097, 1104–05 (E.D.Pa.1984); Greenberg, *supra,* §§ 7.11, 8.13. For our purposes, therefore, § 2–207 does not even come into play. As discussed above, nothing prior to the recap letter indicates that Echo had accepted PTC's offer. The recap letter therefore had no agreement to confirm, and PTC's attempt to twist the language of § 2–207 to its advantage must fail.

Echo's theory of the case, meanwhile, is that acceptance of PTC's offer would occur by performance when Echo started to ship the goods requested in the Spring Order. The UCC allows acceptance by performance, stating that "an order or other offer to buy goods for prompt or current shipment shall be construed as inviting acceptance either by a prompt promise to ship or by the prompt or current shipment of conforming or non-conforming goods." 810 Ill. Comp. Stat. 5/2–206(1)(b). PTC argues in response that 1) its offer in August to purchase goods to be delivered starting in December cannot be characterized as an offer "to buy goods for prompt or current shipment," and 2) performance in December likewise cannot be characterized as "prompt or current shipment." Regardless of whether the four-month gap between offer and acceptance is within the

UCC's definition of promptness, however, the result is the same for PTC. If December performance by Echo is "prompt," PTC loses because Echo never actually accepted. If, on the other hand, December performance is not "prompt," PTC is still out of luck because acceptance by performance was out of the question and, as previously discussed, Echo never otherwise indicated its acceptance. In short, no contract ever existed between PTC and Echo. The District Court therefore properly granted Echo's motion for summary judgment on this counterclaim.

*B. Breach of Contract—Distributorship Agreement*

 PTC's second counterclaim alleges that Echo breached the distributorship agreement when it terminated the distributorship on November 17, 1992. PTC contends that under paragraph 8.1 of the distributorship agreement, Echo could terminate the agreement only at the annual November 30 renewal date and only with 60–days prior notice. Because the notice came only 13 days in advance, PTC argues that Echo had to wait until the following November 30 for the termination to take effect. Echo, on the other hand, argues that either party could terminate the distributorship at any time during the year after giving 60–days notice. The District Court dismissed this counterclaim under Federal Rule of Civil Procedure 12(b)(6), finding that Echo's interpretation of the distribution agreement [2] was "clearly correct." Under Illinois law, the interpretation of an unambiguous contract is a question of law, but ambiguities in the language of a contract regarding the parties' intent create a question of fact. *See Quake Constr., Inc. v. American Airlines, Inc.,* 141 Ill.2d 281, 152 Ill.Dec. 308, 312, 565 N.E.2d 990, 994 (1990); *Bell Fuels, Inc. v. Lockheed Elecs. Co.,* 130 Ill.App.3d 940, 86 Ill.Dec. 115, 119, 474 N.E.2d 1312, 1316 (1985). If the contract is unambiguous, therefore, a breach of contract claim is susceptible to dismissal for failure to state a claim. We review any such dismissal

---

**2.** Distributorship agreements are generally held to be governed by the UCC. *See American Suzuki Motor Corp. v. Bill Kummer, Inc.,* 65 F.3d 1381, 1385–86 (7th Cir.1995); *Carl A. Haas Auto. Imports, Inc. v. Lola Cars Ltd.,* 933 F.Supp. 1381,

1387 (N.D.Ill.1996). As we did in *ECHO I,* we will apply UCC provisions to the distributorship agreement to the extent they have displaced general principles of contract law. *See generally* 810 Ill. Comp. Stat. 5/1–103.

*de novo. LaSalle Nat'l Bank v. Service Merchandise Co.,* 827 F.2d 74, 78 (7th Cir.1987).

Paragraph 8.1 of the agreement is labeled "Term and Renewal" and provides that the agreement shall automatically renew each November 30 for an additional one year term "unless notice of termination is given a minimum of sixty (60) days prior to the date of termination." Paragraph 8.2 of the agreement—labeled "Termination"—provides that "[t]his Agreement may be terminated as follows:" and then lists twelve events that can trigger termination. Significantly, paragraphs 8.2(A) and (B) provide that either PTC or Echo respectively may terminate "with or without cause" upon a minimum of 60 days advance written notice.

PTC argues that paragraphs 8.1, 8.2(A), and 8.2(B) together "create a single right to terminate the contract, governed by a single [sixty-day] notice requirement." Appellant's Br. at 33. Paragraphs 8.2(A) and (B), according to PTC, do not expand the power to terminate beyond paragraph 8.1 but rather explain *why* a party may terminate (i.e., with or without cause). Echo counters that if paragraphs 8.2(A) and (B) only add more detail to the 60–day notice and renewal provisions of paragraph 8.1, the much more logical place to put those details would have been right in paragraph 8.1 rather than along with paragraph 8.2(C), which describes ten conditions under which Echo may *immediately* terminate the agreement. Moreover, the paragraphs' labels themselves suggest that paragraph 8.1 concerns only annual renewal and paragraph 8.2 governs terminations.

■ PTC responds, however, that Echo's interpretation renders paragraph 8.1 meaningless. If a party can terminate at any time during the year so long as the party just gives sixty days notice, what is the point of making November 30 so special as the renewal date? PTC's argument is slightly exaggerated, but it has a core of truth. Paragraph 8.1 has a purpose under Echo's interpretation—it defines the duration of the contract. The problem is that under Echo's interpretation, the contract in practical effect has an indefinite duration. The contract just keeps renewing itself over and over until one of the parties gives sixty days notice at any point during the year. A written agreement may specify that it has an indefinite duration, *see, e.g., Jespersen v. Minnesota Mining and Mfg. Co.,* 288 Ill. App.3d 889, 224 Ill.Dec. 85, 681 N.E.2d 67 (1997), but if the parties so intended here, why did they not just say that instead of creating an annual renewal process every November 30?

■ Standing alone, paragraph 8.2 clearly supports Echo's interpretation. In conjunction with paragraph 8.1, however, we are not so sure. We must, of course, interpret a contract as a whole, and we must try to give meaning and effect to each provision in the contract. *See Schiro v. W.E. Gould & Co.,* 18 Ill.2d 538, 165 N.E.2d 286, 289 (1960); *Snelten v. Schmidt Imp. Co.,* 269 Ill.App.3d 988, 207 Ill.Dec. 578, 581, 647 N.E.2d 1071, 1074, *appeal denied,* 163 Ill.2d 588, 212 Ill.Dec. 438, 657 N.E.2d 639 (1995). Strictly speaking, paragraph 8.1 under Echo's interpretation has a purpose and is therefore not surplusage. But it achieves that purpose in such an odd way that we find the distributorship agreement to be fairly susceptible to both Echo's and PTC's interpretations. The contract is therefore ambiguous, and its construction is a question of fact for the trial court to determine. *See LaSalle,* 827 F.2d at 78; *Farm Credit Bank of St. Louis v. Whitlock,* 144 Ill.2d 440, 163 Ill.Dec. 510, 513, 581 N.E.2d 664, 667 (1991).

## C. Implied Covenant of Good Faith and Fair Dealing

■ Finally, PTC's third counterclaim alleges that Echo breached an implied covenant of good faith and fair dealing when it terminated the distributorship agreement before the Spring Order was fully performed. The District Court dismissed the counterclaim, finding that both the original and amended versions "are, properly read, independent claims for breach of the implied covenant of good faith and fair dealing, a claim which cannot be made under Illinois law."

■ The District Court was correct that Illinois law does not recognize independent claims based on breaches of any implied

duties of good faith. The UCC imposes an obligation of good faith in the performance of all contracts under its domain, *see* 810 Ill. Comp. Stat. 5/1–203. This duty, however, only guides the construction of contracts and does not create independent duties of the contracting parties. *See Baxter Healthcare Corp. v. O.R. Concepts, Inc.,* 69 F.3d 785, 792 (7th Cir.1995); *Korogluyan v. Chicago Title and Trust Co.,* 213 Ill.App.3d 622, 157 Ill. Dec. 690, 697, 572 N.E.2d 1154, 1161 (1991); *see also* 810 Ill. Comp. Stat. 5/1–203, Uniform Commercial Code Comment (Smith–Hurd Supp.1997) ("[T]he doctrine of good faith merely directs a court towards interpreting contracts within the commercial context in which they are created, performed, and enforced, and does not create a separate duty of fairness and reasonableness which can be independently breached."). The obligation of good faith, therefore, creates neither a cause of action sounding in tort nor its own *sui generis* cause of action.

Nonetheless, PTC cites *Hentze v. Unverfehrt,* 237 Ill.App.3d 606, 178 Ill.Dec. 280, 604 N.E.2d 536 (1992), which allowed a local dealer to invoke the covenant of good faith against an equipment manufacturer who terminated the parties' dealership agreement. In fact, the court in *Hentze* affirmed the judgment for the local dealer even though the dealership agreement explicitly allowed either party to terminate the agreement with or without cause. *Id.* at 283, 604 N.E.2d at 539. PTC thus argues that, in light of *Hentze,* its counterclaim surely should have survived Echo's motion to dismiss.

*Hentze,* however, involved an unambiguous breach of contract claim, not an independent claim based on the implied covenant of good faith and fair dealing. The proper place for PTC's implied covenant argument was within a breach of contract claim, not standing alone as its own claim. *See Industrial Specialty Chems., Inc. v. Cummins Engine Co.,* 902 F.Supp. 805, 811 (N.D.Ill.1995); *Stuart Park Assocs. Ltd. Partnership v. Ameritech Pension Trust,* 846 F.Supp. 701, 713–14 (N.D.Ill. 1994). The District Court's dismissal of the counterclaim was therefore proper. Our affirmance of the dismissal is admittedly somewhat formalistic, but it was PTC's decision to

stand on its pleadings and appeal to this Court rather than trying to replead after the District Court's dismissal. *Cf. Boland v. Engle,* 113 F.3d 706, 714–16 (7th Cir.1997); *Knox College v. Celotex Corp.,* 88 Ill.2d 407, 58 Ill.Dec. 725, 430 N.E.2d 976, 983 (1981) ("There appears to be no reason why [the plaintiff] should not have attempted to amend the complaint to conform to the court's ruling.").

The decision of the District Court is *Affirmed* with respect to PTC's first and third counterclaims, *Reversed* with respect to PTC's second counterclaim, and *Remanded* to the District Court for further proceedings consistent with this opinion.