In the
United States Court of Appeals
For the Seventh Circuit

No. 99-3055

Brooklyn Bagel Boys, Inc.,

Plaintiff-Appellant,

v.

Earthgrains Refrigerated
Dough Products, Inc.,

Defendant-Appellee.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 98 C 4421--James F. Holderman, Judge.

Argued February 22, 2000--Decided May 8, 2000

Before Coffey, Easterbrook, and Williams, Circuit
Judges.

Williams, Circuit Judge.  Plaintiff-Appellant
Brooklyn Bagel Boys, Inc. ("Brooklyn Bagel"),
brought this diversity action against Defendant-
Appellee Earthgrains Refrigerated Dough Products,
Inc. ("Earthgrains"), claiming that Earthgrains
wrongfully terminated a contract for the supply
of bagels. Thereafter, Earthgrains filed a motion
for summary judgment, which the district court
granted against Brooklyn Bagel. Prior to this
determination, the district court also granted
Earthgrains' motion to strike the certification
of Gregory Stahl, the former president of
Brooklyn Bagel. This appeal followed the district
court's entry of summary judgment in Earthgrains'
favor. For the reasons discussed below, we affirm
the judgment of the district court.

I

 Brooklyn Bagel produces bagels for third parties
who sell them under their own brand name.
Earthgrains manufactures, distributes, and sells
refrigerated dough products. In April, 1994,
Earthgrains began working on a project to develop
its own proprietary formula for bagels. After
nearly two years, Earthgrains developed a bagel
formula and began to contract with different "co-
packers" to manufacture bagels for distribution

under Earthgrains' brand name. Earthgrains entered into these "co-packing" relationships in an effort to test the viability of its formula without having to incur the substantial capital expense of building its own bagel manufacturing facility.

In late 1994 or early 1995, Earthgrains approached Brooklyn Bagel about being a co-packer for the distribution of bagels out of Earthgrains' Fort Payne, Alabama facility. Contract negotiations began, and the parties eventually entered into a Contract Packaging Agreement ("Contract") on March 25, 1996. Under the Contract, Brooklyn Bagel agreed to process and package bagels for Earthgrains in packaging bearing Earthgrains' brand name or other trademarks owned or licensed by Earthgrains. Brooklyn Bagel also agreed to purchase all of the raw materials and packaging supplies necessary to produce the bagels at its Franklin Park, Illinois facility. Earthgrains, on the other hand, agreed to provide Brooklyn Bagel with all the racks and trays necessary for shipping the bagels. In connection with this obligation, Earthgrains was responsible for picking up the bagels for distribution to its facilities.

The Contract, among other terms, provided a price structure for the bagels. The Contract does not require Earthgrains to purchase a specific quantity of bagels from Brooklyn Bagel. Instead, the Contract stated that Brooklyn Bagel was to process and package the "ordered quantity" of bagels. The Contract required Earthgrains, however, to provide a non-binding forecast every three months, in a form as agreed by the parties, for its expected bagel orders. The parties agreed that the Contract would "continue in effect until either party terminates it upon ninety (90) days prior written notice to the other party of such termination or terminates it as otherwise provided in th[e] Agreement." (Contract para. 6.) Their relationship continued under the Contract until Earthgrains decided to begin manufacturing its own bagels.

In July, 1997, Earthgrains purchased the business of one of its other co-packers. That same month, Brooklyn Bagel's Customer Service Manager for the Earthgrains' account, Vicki Abrams, learned of Earthgrains' plans to install bagel manufacturing equipment in the Fort Payne facility. Abrams then contacted Earthgrains' Marketing Director, Phil Gruszka, concerning this development, and Gruszka indicated that the relationship between the parties would remain unchanged for now. Later that year, Abrams again contacted Gruszka, this time to ask whether Brooklyn Bagel could budget Earthgrains' business

in 1998. Approximately 80 percent of the bagels sold by Brooklyn Bagel to Earthgrains during 1997 were shipped to and distributed out of the Fort Payne facility. Gruszka informed Abrams that "he didn't know what [Earthgrains'] long-term plans were, but [he] didn't think 1998 was an issue." At no point during his conversations with Abrams did Gruszka make any promises to her about Earthgrains' plans for 1998 bagel production, and Abrams had her doubts about whether Earthgrains would continue ordering bagels from Brooklyn Bagel in 1998.

In late 1997, Earthgrains began installing equipment to manufacture bagels at the Fort Payne facility. Earthgrains completed the installation by March of 1998. Around this time, Earthgrains sent Brooklyn Bagel a letter expressing its intent to terminate the Contract. Earthgrains sent the letter in accordance with the Contract's ninety-day written notice of termination provision. Gruszka also verbally advised Abrams of the termination. Earthgrains then stopped ordering bagels from Brooklyn Bagel for its Fort Payne facility, but continued to order for its Des Moines, Iowa facility. Once Abrams realized that Earthgrains stopped ordering bagels for the Fort Payne facility, she wrote Earthgrains' President, William Opdyke, acknowledging receipt of the termination letter. In late March, 1998, Earthgrains sent Brooklyn Bagel a forecast for its expected orders of bagels for distribution out of the Des Moines facility over the remaining months of the Contract, which was to terminate in June, 1998.

In July, 1998, Brooklyn Bagel sued Earthgrains, asserting various state law claims for breach of contract, breach of an implied duty of good faith and fair dealing, promissory estoppel, and unjust enrichment. One year later, the district court granted Earthgrains summary judgment, finding that the terms of the Contract were unambiguous and did not obligate Earthgrains to purchase its bagel needs for the Fort Payne facility from Brooklyn Bagel. The district court ruled that Earthgrains did not breach the parties' Contract and concluded that summary judgment was appropriate with respect to Brooklyn Bagel's remaining claims. Prior to this determination, the district court also granted Earthgrains' motion to strike the certification of Gregory Stahl, the former president of Brooklyn Bagel and a signatory of the parties' Contract, because the certification was not based on Stahl's personal knowledge and did not affirmatively demonstrate his competency to testify on matters contained therein as required by Fed. R. Civ. P. 56(e). Brooklyn Bagel now appeals the district court's summary judgment decision with respect to the

dismissal of the breach of contract and breach of the implied duty of good faith and fair dealing claims, as well as the district court's ruling on Earthgrains' motion to strike.

II

We review de novo the district court's decision to grant summary judgment to Earthgrains. See Johnson v. Zema Sys. Corp., 170 F.3d 734, 742 (7th Cir. 1999). In order to overcome a motion for summary judgment, Brooklyn Bagel must show specific facts sufficient to raise a genuine issue of material fact for trial. See Fed. R. Civ. P. 56(c). In determining whether a genuine issue of material fact exists, we construe the record and all reasonable inferences drawn therefrom in the light most favorable to Brooklyn Bagel, the non-movant. See Senner v. Northcentral Technical College, 113 F.3d 750, 754 (7th Cir. 1997). In reviewing the district court's decision to strike Stahl's certification, however, we look for an abuse of discretion. See Wollenburg v. Comtech Mfg. Co., 201 F.3d 973, 977 (7th Cir. 2000).

A.   Breach of Contract

1.   Did the Parties Enter a Requirements Contract?

Brooklyn Bagel argues that the parties' Contract is an exclusive "requirements contract" obligating Earthgrains to order all of its bagel requirements for the Fort Payne facility from Brooklyn Bagel. Brooklyn Bagel contends that the Contract is ambiguous and that extrinsic evidence demonstrates that the parties intended to enter a requirements contract. In many American jurisdictions, including Illinois (which the parties agree governs this dispute), "a requirements contract exists only when the contract (1) obligates the buyer to buy goods, (2) obligates the buyer to buy goods exclusively from the seller, and (3) obligates the buyer to buy all of its requirements for goods of a particular kind from the seller." Zemco Mfg., Inc. v. Navistar Int'l Transp. Corp., 186 F.3d 815, 817 (7th Cir. 1999) (citing James J. White & Robert S. Summers, Uniform Commercial Code sec. 3-9, at 154-55 (1995), and E. Allan Farnsworth, Farnsworth on Contracts sec. 2-15, at 135-37 (1990)); see Wald v. Chicago Shippers Ass'n, 529 N.E.2d 1138, 1146 (Ill. App. Ct. 1988).

While Brooklyn Bagel asserts that the Contract is ambiguous and therefore capable of being interpreted as a requirements contract, the district court determined that, as a matter of law, the Contract is not a requirements

contract./1 In examining whether the Contract is ambiguous,/2 we first look to the plain language of the Contract. See Atlantic Mut. Ins. Co. v. Metron Eng'g & Constr. Co., 83 F.3d 897, 898 (7th Cir. 1996); Metalex Corp. v. Uniden Corp. of Am., supra, 863 F.2d at 1333. Brooklyn Bagel argues that the plain language of the Contract is ambiguous as to whether it is a requirements contract since the Contract lacks a quantity term. However, we are bound to construe the Contract as a whole, see Echo, Inc. v. Whitson Co., Inc., 121 F.3d 1099, 1105 (7th Cir. 1997) (interpreting Illinois law), and the lack of a quantity term itself does not necessarily render a contract ambiguous.

In relevant part, Paragraph 2(a) of the Contract states:

Subject to Paragraph 2(d) below, upon order by [Earthgrains], [Brooklyn Bagel] will process and pack the ordered quantity of the Product. The Product will be packed in accordance with the packaging instructions set forth in Exhibit B. [Brooklyn Bagel] shall not produce Product in advance of an order, and in no event shall it produce more than 104% of any quantity of Product ordered by [Earthgrains].

Paragraph 2(d), in turn, provides:

On or before each January 1, April 1, July 1 and October 1 during the term hereof, [Earthgrains] shall submit [Brooklyn Bagel] a written forecast (in such form as may be agreed to by the parties) of [Earthgrains'] anticipated requirements for the next succeeding 3 months; provided that such forecasts shall not be binding on either party. [Earthgrains] shall use reasonable efforts to notify [Brooklyn Bagel] at least 4 weeks in advance if [Earthgrains] anticipates a material increase in [Earthgrains'] demand for the Product.

After examining these provisions in context with the Contract as a whole, we agree with the district court that the Contract is not a requirements contract as it does not expressly obligate Earthgrains to purchase all, or any specified quantity, of its requirements of bagels for the Fort Payne facility from Brooklyn Bagel. While such an obligation can be implicit, the district court correctly characterized the Contract as a "buyer's option," similar to the agreement at issue in In re Modern Dairy of Champaign, Inc., 171 F.3d 1106 (7th Cir. 1999). In Modern Dairy, two school districts argued that a dairy contractor was obligated to supply their milk requirements. In examining the existence of a requirements contract, this court observed that

the parties' contractual documents did not explicitly, or by implication, require the school districts to buy their milk requirements exclusively from the dairy. Insofar as the dairy merely agreed to sell milk to the school districts at a specified price, within a specified period of time, the court characterized the parties' agreement as a "buyer's option" rather than a requirements contract.

Brooklyn Bagel, however, asserts that the Contract is no different from the ambiguous supply contract involved in Zemco Mfg., Inc. v. Navistar Int'l Transp. Corp., supra. The facts here are far different than those in Zemco. In Zemco, this court found the supply contract, which also did not include a quantity term, to be susceptible to more than one interpretation. By contrast, in this case, there is but one reasonable interpretation of the contractual language. Paragraph 2 of the Contract clearly gave Earthgrains the discretion to order its bagel needs from Brooklyn Bagel. The contractual language here cannot be alternatively read as an "articulation of the manner in which [the buyer] should place its orders as it has need for the [specified goods]," like the contractual language in Zemco. 186 F.3d at 817. Furthermore, the contract in Zemco, unlike here, contained a priority clause in the event the supplier was unable to meet the production need of the buyer manufacturer. Zemco also involved exclusive dealings between the parties over a period of twelve years, a circumstance not present in this case. Therefore, a variety of textual and non-textual considerations precluded the Zemco court from ruling out the existence of a requirements contract.

Under the Contract, Earthgrains clearly had no obligation to buy all, let alone any quantity, of its bagel requirements from Brooklyn Bagel. Paragraph 2 makes this clear, and the Contract specified a fee to be paid for the "ordered" bagels, which could only increase or decrease at six-month intervals. Under the Illinois Commercial Code, such an agreement is enforceable even though Earthgrains made no reciprocal commitment to buy all its bagel needs from Brooklyn Bagel. See 810 Ill. Comp. Stat. sec. 5/2-205;/3 Modern Dairy, 171 F.3d at 1110 (noting "[a] seller's firm offer to supply the buyer's needs for some good at a specified price and other terms is enforceable . . . even though the buyer makes no reciprocal commitment to buy all its needs from this seller"). Therefore, the district court's characterization of the Contract as a buyer's option was appropriate./4

In an effort to demonstrate that the parties

had a requirements contract, Brooklyn Bagel also points to sec. 2-306(1) of the Uniform Commercial Code,/5 which functions as a primary gap-filler for open quantity terms in requirements contracts. Under Illinois law, however, an essential element of a requirements contract is the promise by the buyer to purchase all of its requirements, or at least a minimum quantity, from the seller. See Torres v. City of Chicago, supra, 632 N.E.2d at 58. No promise of that nature can be found in the Contract. Moreover, Brooklyn Bagel cannot genuinely dispute this lack of exclusivity in the Contract./6 In the absence of exclusivity, there can be no valid requirements contract. See id.; see also White & Summers, supra, sec. 3-9, at 155-56 (noting "[b]ecause section 2-306 depends on exclusivity to determine the quantity, there can be no valid requirements contract without it").

While Brooklyn Bagel argues that Paragraph 2(d) contemplates the use of estimates or forecasts--a common feature of a requirements contract--the Contract provides that "such forecasts shall not be binding on either party," and Brooklyn Bagel acknowledges that the parties rarely used this feature. With respect to Brooklyn Bagel's contention that the parties intended for Brooklyn Bagel to be the sole supplier of bagels at the Fort Payne facility, this promise is nowhere to be found in the Contract. In fact, the Contract does not reference any geographic region or distribution facility. The parties surely could have included this term in the Contract had they desired. In any event, Brooklyn Bagel cannot point to any contractual language indicating that it would be a breach of contract for Earthgrains to either (1) stop ordering from Brooklyn Bagel, (2) use another manufacturer, or (3) manufacture its own bagels.

Accordingly, the Contract, taken as a whole, overwhelmingly establishes that the parties did not enter a requirements contract. Instead, the Contract provided an agreement by Brooklyn Bagel to manufacture bagels for Earthgrains at a specified price, within an agreed period, subject to Earthgrains' bagel needs.

Brooklyn Bagel nevertheless argues that extrinsic evidence demonstrates that Earthgrains was obligated to buy all of its bagel requirements for the Fort Payne facility from Brooklyn Bagel. The district court found Brooklyn Bagel's extrinsic evidence inadmissible or, alternatively, unsupportive of its position. As an initial matter, the Contract contains an integration clause stating that the Contract between the parties "constitutes the entire agreement of the parties," and "supersedes all

prior and contemporaneous agreements." (Contract para. 25.) Given such a clause, the parol evidence rule generally forbids the use in evidence of a prior or contemporaneous agreement or terms not included in the Contract. See Sunstream Jet Exp., Inc. v. International Air Serv. Co., Ltd., 734 F.2d 1258, 1265 (7th Cir. 1984) (noting under Illinois law "if the contract imports on its face to be a complete expression of the whole agreement, it is presumed that the parties introduced into it every material item, and parol evidence cannot be admitted to add another term to the agreement").

Notwithstanding the parol evidence rule, extrinsic evidence can be admitted to discover the parties' genuine intent when a contract is ambiguous, see FDIC v. W.R. Grace & Co., supra, 877 F.2d at 620-21; Modern Dairy, 171 F.3d at 1109, but "there must be either contractual language on which to hang the label of ambiguous or some yawning void . . . that cries out for an implied term." Bidlack v. Wheelabrator Corp., 993 F.2d 603, 608 (7th Cir. 1993) (en banc) (lead opinion). Extrinsic evidence cannot be used "to create a conflict completely apart from the contract itself." R.T. Hepworth Co. v. Dependable Ins. Co., Inc., 997 F.2d 315, 318 (7th Cir. 1993). Brooklyn Bagel neither points to any contractual language that is reasonably susceptible to differing interpretations, nor suggests a void that "cries out for" an implied term in the Contract.

As a further constraint on the consideration of this evidence, the Illinois Commercial Code only allows extrinsic evidence including course of performance, course of dealing, and usage of trade to be considered when it is reasonably consistent with the express terms of the contract. See 810 Ill. Comp. Stat. sec.sec. 5/2-208(2), 5/2-202. Brooklyn Bagel does not seek to introduce evidence that is consistent with the terms of the Contract,/7 and it otherwise fails to establish any ambiguity in the terms of the Contract. We conclude, as a matter of law, that the parties did not enter a requirements contract.

2.  Did Earthgrains Breach the Termination Provision?

In a separate argument, which bears more directly on its breach of contract claim, Brooklyn Bagel asserts that even if the parties did not enter a requirements contract, the Contract is ambiguous with respect to Earthgrains' performance obligation under the termination notice provision. Brooklyn Bagel

claims that the Contract obligated Earthgrains to continue ordering its bagel requirements from Brooklyn Bagel during the ninety-day termination notice period. According to Brooklyn Bagel, Earthgrains therefore breached the termination notice provision when it stopped ordering bagels for the Fort Payne facility from Brooklyn Bagel and began manufacturing its own bagels during the ninety-day notice period.

The Contract, however, only required Earthgrains to provide Brooklyn Bagel with ninety-day written notice of termination. (Contract para.6.) There is no language contained within the termination notice provision itself, or the Contract as a whole, that obligated Earthgrains to order bagels from Brooklyn Bagel even during the ninety-day notice period, and Brooklyn Bagel has failed to show that the parties intended such a performance obligation in the face of the unambiguous terms of the Contract. Since Brooklyn Bagel does not dispute the adequacy or form of the notice provided, it has not established any breach of the Contract by Earthgrains and Earthgrains was entitled to summary judgment on the contract claim because there are no genuine issues of material fact for trial.

B. Implied Duty of Good Faith and Fair Dealing

Brooklyn Bagel further contends that Earthgrains breached its implied duty of good faith and fair dealing by not ordering bagels during the ninety-day termination notice period. Under Illinois law, "the covenant of good faith and fair dealing is not an independent source of duties for the parties to a contract." Baxter Healthcare Corp. v. O.R. Concepts, Inc., 69 F.3d 785, 792 (7th Cir. 1995) (interpreting Illinois law). While "[t]he UCC [810 Ill. Comp. Stat. sec. 5/1-203] imposes an obligation of good faith in the performance of all contracts under its domain," this duty merely "guides the construction of contracts and does not create independent duties of the contracting parties." Echo, Inc., 121 F.3d at 1106. Therefore, Brooklyn Bagel cannot bring a separate cause of action on this basis. Id.

While acknowledging that the implied covenant is "a tool of construction," Brooklyn Bagel insists that Earthgrains acted in bad faith by not ordering bagels during the ninety-day notice period. In Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting, 908 F.2d 1351, 1357 (7th Cir. 1990), the court stated:

"Good faith" is a compact reference to an implied undertaking not to take opportunistic advantage in a way that could not have been contemplated at the time of drafting, and which therefore was not

resolved explicitly by the parties. When the contract is silent, principles of good faith-- such as the UCC's standard of honesty in fact, UCC sec. 1-201(19), and the reasonable expectations of the trade, UCC sec. 2-103 . . . fill the gap.

There is nothing in the Contract that prohibits Earthgrains from manufacturing its own bagels, nor has Brooklyn Bagel shown that this reasonably "could not have been contemplated" by the parties. Accordingly, the district court properly dismissed Brooklyn Bagel's claim for breach of the implied duty of good faith and fair dealing.

C.  Motion to Strike the Certification of Gregory Stahl

Brooklyn Bagel finally contends that the district court erred by striking the certification of Gregory Stahl, the former president of Brooklyn Bagel and a signatory to the Contract. Brooklyn Bagel initially asserts that its breach of contract claim can be established without any consideration of Stahl's certification. According to Brooklyn Bagel, Stahl's certification merely offers additional extrinsic evidence that the parties intended to enter into a requirements contract. While consideration of this evidence is unnecessary in light of the unambiguous Contract, we nonetheless review the district court's ruling for an abuse of discretion.

Stahl's certification purports to express his own recollection before and at the time of the execution of the Contract. The district court excluded Stahl's certification because the certification was not based on his personal knowledge and did not establish his competency to testify to the matters contained in the certification. The district court based its ruling on Fed. R. Civ. P. 56(e). Under Rule 56(e), an affidavit "shall be made on personal knowledge, shall set forth facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."

An examination of the record indicates that the district court did not abuse its discretion in striking Stahl's certification. As the district court observed, Stahl gave deposition testimony that he was "really on the sidelines of [contract negotiations]" and "was being updated as th[e] [contract negotiations] went along." Brooklyn Bagel further admits that Stahl was not involved in the "day-to-day" contractual negotiations. (Appellant's Br. at 35.) Stahl, however, specifically testifies in the certification about

the understanding the parties had in executing the Contract. Given his conflicting deposition testimony, Stahl's understanding of the Contract, which he did not form independent of others, is of no evidentiary value. Therefore, the district court did not err in finding that Stahl lacked personal knowledge about the information contained in the certification.

The district court was also correct in its observation that Stahl's certification presented many self-serving, conclusory allegations, which were based on his private expectations of the Contract. Stahl's private expectations are of no consequence, particularly since he offered no factual basis to demonstrate Earthgrains' awareness of his expectation or understanding. See Sethness-Greenleaf, Inc. v. Green River Corp., 65 F.3d 64, 66-67 (7th Cir. 1995). The district court's grant of Earthgrains' motion to strike Stahl's certification did not constitute an abuse of discretion.

III

For the reasons stated above, we AFFIRM the judgment of the district court.

/1 This court has recognized that "[i]f a contract is unambiguous, by definition no material issues of fact exist regarding the contract's interpretation; that interpretation is a question of law for the court." Metalex Corp. v. Uniden Corp. of Am., 863 F.2d 1331, 1333 (7th Cir. 1988). But if the contract is ambiguous, the contract's meaning is a question for the trier of fact. Id.

/2 According to Illinois law, a contract is ambiguous only if it is "reasonably and fairly susceptible to more than one construction." Omnitrus Merging Corp. v. Illinois Tool Works, Inc., 628 N.E.2d 1165, 1168 (Ill. App. Ct. 1993) (internal quotation marks and citation omitted). "The fact that parties to a contract disagree about its meaning does not [necessarily] show that it is ambiguous." FDIC v. W.R. Grace & Co., 877 F.2d 614, 621 (7th Cir. 1989).

/3 This section in relevant part states:

An offer by a merchant to buy or sell goods in a signed writing which by its terms gives assurance that it will be held open is not revocable, for lack of consideration, during the time stated or if no time is stated for a reasonable time, but in no event may such period of irrevocability

exceed 3 months . . . .

/4 We note that the district court alternately viewed the parties' relationship as a series of separate contracts, with the added element that several of the contract terms would relate back to the original Contract, presumably on the theory that each time Earthgrains placed an order for bagels, a contract between the parties was created. This characterization is consistent with a buyer's option since the original Contract (although denominated as such by the parties) is akin to an offer by Brooklyn Bagel to manufacture bagels for Earthgrains at a specified price, within an agreed period. See White & Summers, supra, sec. 3-9, at 157; see also Streich v. General Motors Corp., 126 N.E.2d 389, 393-95 (Ill. App. Ct. 1955). Earthgrains manifested its assent to the offer, which Brooklyn Bagel never revoked, by placing orders for the bagels, thus triggering the obligations contemplated by the original Contract (i.e., offer). See Torres v. City of Chicago, 632 N.E.2d 54, 58 (Ill. App. Ct. 1994).

/5 This section states as follows:

A term which measures the quantity by the output of the seller or the requirements of the buyer means such actual output or requirements as may occur in good faith, except that no quantity unreasonably disproportionate to any stated estimate or in the absence of a stated estimate to any normal or otherwise comparable prior output or requirements may be tendered or demanded.

UCC sec. 2-306(1); 810 Ill. Comp. Stat. sec. 5/2-306(1).

/6 Paragraph 2(a), for example, clearly enjoined Brooklyn Bagel from producing bagels unless Earthgrains placed an order for them, and even then Brooklyn Bagel could produce no more than "104% of any quantity" of bagels ordered by Earthgrains.

/7 Brooklyn Bagel's extrinsic evidence, including its supposed course of dealing, course of performance, and trade usage evidence, attempts to show that the parties intended for Brooklyn Bagel to be the sole supplier of bagels at the Fort Payne facility and that Earthgrains agreed to buy all of its bagel requirements for that location from Brooklyn Bagel. However, we agree with the district court that Brooklyn Bagel's extrinsic evidence, taken as a whole, is inconsistent with the unambiguous terms of the Contract. The evidence presents little, or no, objective proof of (1) prior exclusive dealings

between the parties, (2) an industry custom over the usage of a single co-packer for a specific geographic region, and (3) a course of performance indicating a requirements contract. See Murphy v. Keystone Steel & Wire Co., 61 F.3d 560, 564 (7th Cir. 1995) (noting "[t]he party claiming that a contract is ambiguous must first convince the [court] that this is the case . . . and must produce objective facts, not subjective and self-serving testimony, to show that a contract which looks clear on its face is actually ambiguous") (internal citation omitted and emphasis added); accord Ashan v. Eagle, Inc., 678 N.E.2d 1238, 1241 (Ill. App. Ct. 1997) (citing Home Ins. Co. v. Chicago & Northwestern Transp. Co., 56 F.3d 763, 768 (7th Cir. 1995)). Furthermore, the evidence is critically undercut by the fact that Brooklyn Bagel supplied bagels for distribution out of Earthgrains' Des Moines, Iowa facility. Since the Contract does not contain any geographic restrictions on the distribution of bagels sold by Brooklyn Bagel, this strongly suggests that Earthgrains had complete flexibility in the manner in which it distributed bagels sold by Brooklyn Bagel.