ZEMCO MANUFACTURING,
INCORPORATED, Plaintiff–
Appellant,

v.

NAVISTAR INTERNATIONAL TRANS-
PORTATION CORPORATION, De-
fendant–Appellee.

No. 98–3795.

United States Court of Appeals,
Seventh Circuit.

Argued March 29, 1999.

Decided July 27, 1999.

Gene R. Leeuw (argued), Leeuw, Plopper & Beeman, Indianapolis, IN, William D. Swift, Swift & Finlayson, Fort Wayne, IN, for Plaintiff–Appellant.

Robert D. Moreland (argued), Baker & Daniels, Fort Wayne, IN, Ron G. Robbins, Navistar International Transportation Corporation, Chicago, IL, for Defendant–Appellee.

Before RIPPLE, ROVNER and EVANS, Circuit Judges.

RIPPLE, Circuit Judge.

Zemco Manufacturing ("Zemco") brought this action against Navistar International Transportation ("Navistar"), alleging breach of contract (Count I) and conspiracy to intentionally interfere with a contract (Count III). The district court granted Navistar summary judgment with respect to these claims, and Zemco appeals.[1] For the reasons set forth in the following opinion, we affirm in part and reverse and remand in part the judgment of the district court.

## I

## BACKGROUND

Zemco manufactured and supplied machined parts to Navistar from 1968 to 1995. In 1983, the parties entered into a sales contract that was renewable on a yearly basis. From that date until 1995, Navistar purchased all of its requirements from Zemco. In January 1995, however, the sole shareholders of Zemco, Alan Zemen and Joel Pecoraro, fell into disagreement. Consequently, Pecoraro sold his interest in Zemco to Zemen. Pecoraro subsequently formed Pecoraro Manufacturing, Inc. ("PMI"). In the same year, Navistar began to buy parts from PMI and to phase out its purchase of parts from Zemco.

In Count I, Zemco alleges that Navistar breached its contract to buy parts from Zemco. Zemco claims that the contract provided that Navistar would purchase parts exclusively from Zemco. The district court, however, granted Navistar summary judgment on this claim; it held that the contract was not an exclusive "requirements" contract and that the oral extensions of the yearly contract violated the statute of frauds.

In Count III, Zemco alleges that Navistar conspired with Pecoraro to interfere

---

1. In Count II, Zemco alleges breach of a separate contract. The district court did not decide that claim. However, the district court directed entry of final judgment for Counts I and III pursuant to Federal Rule of Civil Procedure 54(b). Therefore, the finality requirement of 28 U.S.C. § 1291 is not violated by this appeal.

tortiously with Zemco's rights under the contract. The district court granted summary judgment to Navistar on this claim because Pecoraro and Zemco had entered into a contract allowing Pecoraro to compete with Zemco.

## II

## DISCUSSION

### A. Whether the Contract Was an Exclusive Requirements Contract

■ The district court concluded that, as a matter of law, this contract is not a requirements contract. "A requirements contract is one in which the purchaser agrees to buy all of its needs of a specified material exclusively from a particular supplier, and the supplier agrees, in turn, to fill all of the purchaser's needs during the period of the contract." *Indiana–American Water Co. v. Seelyville*, 698 N.E.2d 1255, 1259 (Ind.Ct.App.1998). This definition, which reflects not only Indiana law but the law of other American jurisdictions, establishes that a requirements contract exists only when the contract (1) obligates the buyer to buy goods, (2) obligates the buyer to buy goods exclusively from the seller, and (3) obligates the buyer to buy all of its requirements for goods of a particular kind from the seller. *See* James J. White & Robert S. Summers, *Uniform Commercial Code* § 3–9, at 154–55 (1995); *see also* E. Allan Farnsworth, *Farnsworth on Contracts* § 2–15, at 135–37 (1990).

■ We first turn to the language of the contract. The district court took the view that the language of the contract made clear that this contract is not, as a matter of law, a requirements contract. The court stressed that the language of what it considered the most important paragraphs is permissive: Navistar is required to purchase "such quantities of the items listed herein as [it] might order or schedule." By the express language of the contract, Navistar could choose the quantities that it

wished to order. Paragraphs 2 and 4 state, in part:

2. Unless otherwise specified, deliveries are to be made in quantities and at times specified in shipping schedules furnished to the Seller and from time to time by the Buyer, and the Buyer shall not be obligated to take any goods, the delivery of which has not been specified in such shipping schedules....

4. Buyer shall have the right at any time and from time to time to cancel, in whole or in part, the deliveries specified and the authorizations contained in any shipping schedule given to the Seller.

R.1, Ex.A.

This language, standing alone, certainly does not establish the existence of a requirements contract. Nevertheless, we cannot say that it establishes, as a matter of law, that the contract is not such a contract. Rather, this language, upon which the district court and Navistar so heavily rely, is susceptible to several interpretations. As Navistar suggests, it may be construed as giving Navistar complete authority to decide how many parts to order from Zemco. On the other hand, the language may be read simply as an articulation of the manner in which Navistar should place its orders as it has need for the parts.

■ Other considerations, based on the language of the contract, make it even more clear that the contract is ambiguous as to whether it is a requirements contract. As Zemco notes, the contract provides that, in the event that Zemco cannot fill all the orders placed with it, it will give priority to the orders of Navistar as permitted by Indiana Code § 26–1–2–615. This contractual provision, standing alone, does not establish that the contract is a requirements contract. As the statutory language and its commentary suggest, the parties are entitled to great flexibility in agreeing how to allocate sales in the event all demands cannot be met. *See* Ind.Code

§ 26–1–2–615 & UCC cmt. 8.[2] It is quite possible, therefore, for parties to contract under this section of the Code for an arrangement other than a requirements contract. In this case, the contract contains a priority clause, and it also lacks a specific reference to quantity anywhere in the contract. As the Fifth Circuit has noted, in the absence of any explicit agreement as to quantity, the section of the Code authorizing requirements contracts is "the primary 'gap filler' in the Code for quantity terms." *Riegel Fiber Corp. v. Anderson Gin Co.*, 512 F.2d 784, 789 (5th Cir.1975); *see also Gestetner Corp. v. Case Equip. Co.*, 815 F.2d 806, 811 (1st Cir.1987).

When we evaluate all of these textual considerations, we must conclude that the contract, taken as a whole, is ambiguous and that further investigation as to whether the parties intended a requirements contract is required. Resort to extrinsic evidence is appropriate in such a situation. Indeed, the Indiana Commercial Code makes clear that the provisions ought to be harmonized with the parties' course of dealing and the usage of trade. Indiana Code § 26–1–2–208(2) states:

> The express terms of the agreement and any such course of performance, as well as any course of dealing and usage of trade, shall be construed whenever reasonable as consistent with each other; but when such construction is unreasonable, express terms shall control course of performance and course of performance shall control both course of dealing and usage of trade.

Ind.Code § 26–1–2–208(2). Here, the text of the contract, in what it affirmatively says and in what it omits, renders the intent of the parties ambiguous. It is therefore necessary to construe these terms in conformity with the parties' course of dealing and the usage of trade. *See Universal Power Systems, Inc. v. Godfather's Pizza, Inc.*, 818 F.2d 667, 671 (8th Cir.1987). Examination of the course of dealing, to the extent that it is developed in this record, supports the conclusion that there exists a genuine issue of triable fact with respect to the parties' intent. For 12 years—every year in which the contract was in effect—Navistar purchased all of its requirements from Zemco. We therefore cannot affirm the district court's grant of summary judgment to Navistar on this ground.[3]

## B. Whether the Contract Renewal Violated the Statute of Frauds

As an alternate ground for dismissal, the district court held that the renewal of the contract between Zemco and Navistar did not comply with the statute of frauds. We now turn to an evaluation of that contention.

### 1.

In 1983, the parties entered into the original written contract for the sale of

---

2. Section 2–615 states, in part:

> Except so far as a seller may have assumed a greater obligation and subject to IC 26–1–2–614 on substituted performance:
> (a) Delay in delivery or non-delivery in whole or in part by a seller who complies with paragraphs (b) and (c) is not a breach of his duty under a contract for sale if performance as agreed has been made impracticable by the occurrence of a contingency the non-occurrence of which was a basic assumption on which the contract was made or by compliance in good faith with any applicable foreign or domestic governmental regulation or order whether or not it later proves to be invalid.

> (b) Where the causes mentioned in paragraph (a) affect only a part of the seller's capacity to perform, he must allocate production and deliveries among his customers but may at his option include regular customers not then under contract as well as his own requirements for further manufacture. *He may so allocate in any manner which is fair and reasonable.*

Ind.Code § 26–1–2–615 (emphasis added).

3. *In re Modern Dairy*, 171 F.3d 1106 (7th Cir.1999), is not to the contrary. In that case, the course of dealings indicated merely a month or two of exclusive dealings between the parties. Here, in contrast, there were 12 years of exclusive dealings.

parts. The contract was to last one year, but it was extended by written agreements until 1987. There has not been a written contract extension since 1987; the parties, however, have agreed orally to extend the contracts. Navistar submits that the oral contract extensions violate the statute of frauds. Zemco counters that simple time extensions or renewals of the contract need not be in writing because they are merely a modification of a non-definite contract term.

We begin our analysis of this question with Indiana Code § 26–1–2–209(3), which generally applies to contract modifications.[4] It states that "[t]he requirements of the statute of frauds (IC 26–1–2–201) must be satisfied if the contract as modified is within its provisions." Ind.Code § 26–1–2–209(3). The interpretation of this provision, which is identical to Uniform Commercial Code ("UCC") § 2–209(3), has generated controversy among courts and commentators. One view is that all contract modifications must be in writing; another view is that only modifications of terms that are required to be in writing under UCC § 2–201 must be in writing. Under the second view, the time extension would not need to be in writing because the length of a contract is not a type of term that needs to be in writing.

*See* Ind.Code § 26–1–2–201 & UCC cmt. 1.[5]

Indiana courts have not interpreted the meaning of § 26–1–2–209(3). A substantial number of the courts in other jurisdictions that have considered identical UCC provisions have held that every contract modification must be in writing. *See Van Den Broeke v. Bellanca Aircraft Corp.*, 576 F.2d 582, 584 (5th Cir.1978) (orally modified warranty); *Green Constr. Co. v. First Indem. of America Ins. Co.*, 735 F.Supp. 1254, 1261 (D.N.J.1990) (orally modified delivery terms); *Leasing Serv. Corp. v. Diamond Timber, Inc.*, 559 F.Supp. 972, 976–77 (S.D.N.Y.1983) (orally modified lease terms); *Cooley v. Big Horn Harvestore Sys., Inc.*, 767 P.2d 740, 744 (Colo.Ct. App.1988), *rev'd on other grounds*, 813 P.2d 736 (Colo.1991) (orally modified warranty). Although these courts have provided little analysis, they essentially interpret § 2–209(3) to mean that, if the postmodification contract fits within the terms of § 2–201 (i.e., it is a sale of goods for more than $500), then any modification of it must be in writing. The Indiana Commentary appears to agree: "Indiana cases seem to use a rather mechanical test—if the original contract had to be in writing

4. Neither party contends that the time extension was not a contract modification within the meaning of Indiana Code § 26–1–2–209.

5. The statute of frauds of the Indiana Commercial Code provides in relevant part:
    Except as otherwise provided in this section, a contract for the sale of goods for the price of five hundred dollars ($500) or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker. A writing is not insufficient because it omits or incorrectly states a term agreed upon, but the contract is not enforceable under this paragraph beyond the quantity of goods shown in such writing.
    Ind.Code § 26–1–2–201 Comment 1 states:
    The required writing need not contain all the material terms of the contract and such

material terms as are stated need not be precisely stated. All that is required is that the writing afford a basis for believing that the offered oral evidence rests on a real transaction. It may be written in lead pencil on a scratch pad. It need not indicate which party is the buyer and which the seller. The only term which must appear is the quantity term which need not be accurately stated but recovery is limited to the amount stated. The price, time and place of payment or delivery, the general quality of the goods, or any particular warranties may all be omitted.... Only three definite and invariable requirements as to the memorandum are made by this subsection. First, it must evidence a contract for the sale of goods; second, it must be "signed", a word which includes any authentication which identifies the party to be charged; and third, it must specify a quantity.
    Ind.Code § 26–1–2–201 UCC cmt. 1.

then the modifying agreement must also." Ind.Code § 26–1–2–209 Ind. cmt. 3.

At least one court has held that the writing requirement for modifications applies only to either a change in consideration, or a change in a term that the UCC statute of frauds requires to be in writing. *See Costco Wholesale Corp. v. World Wide Licensing Corp.*, 78 Wash.App. 637, 898 P.2d 347, 351 & n. 5 (1995). This view also appears to be favored among commentators.[6] The general theory behind this approach is that it would be anomalous, if not inconsistent, to require that a modification be in writing if the same term in the original contract could be proven by parol evidence. Moreover, proponents of this view argue, § 2–209(3) explicitly invokes only the writing requirements contained in § 2–201—nothing less and nothing more.

■ We need not decide in the abstract the correct interpretation of § 2–209(3). Because the jurisdiction of the district court was based on the diversity of citizenship of the parties, it was obligated to apply the law of Indiana. *See Erie R.R. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Although the Indiana courts have not spoken directly on the matter, we believe that the district court was correct in its estimation that Indiana would follow the majority of jurisdictions and hold that the extension of the contract needed to be in writing. Several considerations lead to this conclusion. First, as we pointed out in *Northrop Corp. v. Litronic Industries*, 29 F.3d 1173, 1178 (7th Cir. 1994), when a state has tended to follow majority rules and because there is an interest in the uniform nationwide application of the Uniform Commercial Code, we start with a presumption that the state would adopt the majority position. We believe that it is appropriate to articulate the methodology that we employed in *Northrop* in this case as well. Here, the presumption has not been rebutted. There is no suggestion in this record that Indiana would not follow the majority rule or that its courts would not consider important the goal of uniformity in the interpretation of the Commercial Code. Indeed, the Indiana Legislature has affirmatively directed that, in construing the Code, the goal of uniformity ought to be a guidepost of decision.[7] Moreover, there is some evidence that the Indiana courts would consider that an extension of the contract would need to be in writing. As we have noted earlier, the influential Indiana Commentary on the Indiana Commercial Code suggests strongly that Indiana would require compliance with the statute of frauds in this case.[8]

6. *See* 2A Ronald A. Anderson, *Anderson on the Uniform Commercial Code* § 2–209:92, at 64 (1997); 1 James J. White & Robert S. Summers, *Uniform Commercial Code* § 1–6, at 39 (1995); Michael J. Herbert, *Toward a Uniform Theory of Warranty Creation Under Articles 2 and 2A of the Uniform Commercial Code*, 1990 Columbia Business L.Rev. 265, 303 (1990); John E. Murray, Jr., *The Modification Mystery: Section 2–209 of the Uniform Commercial Code*, 32 Vill. L.Rev. 1, 28 (1987); Jeanette K. Brooks, Comment, *Parol Modification and the Statute of Frauds: Fitting the Pieces Together Under the Uniform Commercial Code*, 21 Campbell L.Rev. 307, 317–18 (1999); *see generally* Thomas D. Crandall et al., *Uniform Commercial Code* § 3.5.3, at 3:67–3:69 (1993).

7. Indiana's version of the UCC states in relevant part:

(1) IC 26–1 shall be liberally construed and applied to promote its underlying purposes and policies.
(2) Underlying purposes and policies of IC 26–1 are:
    (a) to simplify, clarify, and modernize the law governing commercial transactions;
    (b) to permit the continued expansion of commercial practices through custom, usage, and agreement of the parties;
    (c) *to make uniform the law among the various jurisdictions*.
Ind.Code § 26–1–1–102 (emphasis added).

8. Indiana courts regularly refer to the Commentary in construing sections of the Indiana Commercial Code. *See, e.g., Farmers Loan & Trust Co. v. Letsinger*, 652 N.E.2d 63, 66 (Ind. 1995); *Ambassador Fin. Servs., Inc. v. Indiana Nat'l Bank*, 605 N.E.2d 746, 751 (Ind.1992); *Church Bros. Body Serv., Inc. v. Merchants Nat'l Bank & Trust Co.*, 559 N.E.2d 328, 330 (Ind.Ct.App.1990); *Citizens Bank of Michigan*

## 2.

Having determined that the requirements of § 26–2–1–201 apply to this modification, we must determine whether the requirements are satisfied in this case. Zemco argues that various computer printouts created by Navistar are sufficient to meet the requirements. Those printouts indicate that the contract at issue here had been extended for the year in question, until June 14, 1996. They appear to be forms created by Navistar as a history of the contract and as an update of orders placed by Zemco.

Navistar argues that these printouts are an insufficient writing. It notes that Official Comment 3 to Indiana Code § 26–1–2–209(3) states that an authenticated memo modifying an original contract "is limited in its effect to the quantity of goods set forth in it." Ind.Code § 26–1–2–209(3). Because Navistar paid for all the parts listed in the printouts, it argues that it cannot be held accountable for any more parts.

We cannot accept Navistar's argument. A careful reading of comment 3, in conjunction with § 2–201 and § 2–306, indicates that this comment is inapplicable to requirements contracts. The comment's suggestion that the effect of a modification memorandum is limited to quantities set forth in the memorandum is a reference to § 2–201's requirement that a contract is not enforceable "beyond the quantity of goods shown in such writing." Ind.Code § 26–1–2–201. However, this quantity limitation does not (indeed, cannot) apply to requirements contracts. See Ind.Code § 26–1–2–306 cmt. 1. Therefore, the effect of a modification memorandum is not limited to the quantities listed in it if the contract is a requirements contract. The district court, believing that the contract was not a requirements contract, accepted Navistar's argument. However, because we have held that there is a material issue

of fact regarding whether the contract is a requirements contract, we cannot accept Navistar's contention.

Navistar also argues that the printouts do not meet the signature requirement of § 26–1–2–201. That section, when read in conjunction with § 26–1–2–209(3), requires that a contract modification be "signed by the party against whom enforcement is sought." Ind.Code § 26–1–2–201. Indiana's Commercial Code states: " 'Signed' includes any symbol executed or adopted by a party with present intention to authenticate a writing." Ind.Code § 26–1–1–201(39). The Official Comment to that section states:

> The inclusion of authentication in the definition of "signed" is to make clear that as the term is used in this Act a complete signature is not necessary. Authentication may be printed, stamped or written; it may be by initials or by thumbprint. It may be on any part of the document and in appropriate cases may be found in a billhead or letterhead. No catalog of possible authentications can be complete and the court must use common sense and commercial experience in passing upon these matters. The question always is whether the symbol was executed or adopted by the party with present intention to authenticate the writing.

Ind.Code § 26–1–1–201 cmt. 39. This court, applying Illinois' version of the UCC, has previously held that typed initials or a letterhead could suffice as a signature. See Monetti v. Anchor Hocking Corp., 931 F.2d 1178, 1182, 1185 (7th Cir.1991); see also Owen v. Kroger Co., 936 F.Supp. 579, 583–85 (S.D.Ind.1996) (applying Indiana law).

We cannot say, on this record, that all of the computer printouts in this case are not adequately "signed." The name "Navistar" is stamped or typed on some of these documents. There is an issue of fact re-

City v. Hansom, 497 N.E.2d 581, 583 (Ind.Ct. App.1986); United Leaseshares, Inc. v. Citi- zens Bank & Trust Co., 470 N.E.2d 1383, 1389–90 (Ind.Ct.App.1984).

garding whether these markings were executed with the intention of authenticating the documents. *See id.* at 585. Summary judgment should therefore not be granted on Count I.

## C. Conspiracy to Tortiously Interfere with Contract

■ The district court also dismissed Count III of the complaint. This Count alleges that Pecoraro (Zemco's former shareholder who left and formed his own business) conspired with Navistar to tortiously interfere with the contract between Zemco and Navistar. It alleges that Pecoraro's firm, PMI, unlawfully conspired with Navistar to end Zemco's right to supply Navistar with all of its required machined parts.

■ For there to be a conspiracy in this case, there must be an underlying claim against PMI for tortious interference with the Zemco contract. Under Indiana law, a plaintiff must prove the following elements for such a claim: "(i) existence of a valid and enforceable contract; (ii) defendant's knowledge of the existence of the contract; (iii) defendant's intentional inducement of breach of the contract; (iv) the absence of justification; and (v) damages resulting from defendant's wrongful inducement of the breach." *Winkler v. V.G. Reed & Sons, Inc.,* 638 N.E.2d 1228, 1235 (Ind. 1994).

The parties dispute whether the interference was justified by the terms of a contract between Pecoraro (former part-owner of Zemco) and Zemco allowing Pecoraro to compete with Navistar. More specifically, Section 2.07 of the Agreement states:

> Permission of Seller to Compete.... [T]he Seller shall, notwithstanding his continued employment with Zemco, or his position as an officer or director ..., be entitled to actively seek new employment for himself or investment opportunities for himself, including but not limited to, the establishment of a business entity which may compete with Zem-

co.... Seller shall be entitled to discuss potential business relationships between Seller or Seller's business ... and present, past and prospective customers of Zemco. These potential business relationships may include, but are not limited to, the manufacture and sale by Seller or Seller's Business of any and all parts currently made (or proposed to be made) by Zemco.

The district court held that this broad competition agreement justified Pecoraro's actions. The competition agreement clearly contemplates that Pecoraro will seek to take Zemco's current customers.

■ However, an agreement to compete does not necessarily excuse tortious interference with an existing contract. "The fact that one is a competitor for the business of a third person does not prevent his causing a breach of an existing contract with the other from being an improper interference if the contract is not terminable at will." Restatement (Second) of Torts § 768(b) at 168 (1997). Indiana courts have generally utilized this Restatement in tortious interference claims. *See Harvest Life Ins. Co. v. Getche,* 701 N.E.2d 871, 877 (Ind.Ct.App.1998). The Indiana Supreme Court, expressing concern that tort remedies not displace traditional contract remedies, has clarified § 768 by noting that inducement to breach a contract is not always sufficient for a tortious interference claim. "[T]he overriding question is whether the defendants' conduct has been fair and reasonable under the circumstances." *Winkler,* 638 N.E.2d at 1235. Tortious interference claims may be premised, noted the court, on an allegation of misrepresentations, applied unfair economic pressure, threatened litigation, or willful or spiteful intent to injure. *See id.* at 1235–36.

Zemco has alleged insufficient facts indicating that Pecoraro engaged, or conspired to engage, in conduct that could serve as a premise for such a claim. Zemco does allege that *Navistar* made misrepresenta-

tions to Zemco regarding its continuing purchases from Zemco. However, no agent of PMI is specifically alleged to have engaged or participated in these misrepresentations. Zemco also alleges that Pecoraro's son inadequately prepared for an audit of Zemco. Zemco does not explain, however, how this audit affected the parties' contractual obligations. When Zemco complained about its lack of preparation for the audit, Navistar agreed to delay it. Zemco, therefore, has failed to produce sufficient evidence and explanation from which it could reasonably be determined that PMI engaged in the kind of unfair and unreasonable conduct required for a tortious interference claim. *See, e.g., Harvest Life*, 701 N.E.2d at 877 (noting that, in that case, "competition along with a customer's own free choice as to which ... company with which he or she chooses to do business supports the trial court's granting of summary judgment on this issue"). We therefore affirm the judgment of the district court with respect to Count III.

## Conclusion

Accordingly, the judgment of the district court is affirmed in part and reversed in part. We remand for proceedings not inconsistent with this opinion. Zemco may recover its costs in this appeal.

AFFIRMED in Part and REVERSED and REMANDED in Part.