In re ANCHOR GLASS CONTAINER
CORPORATION, Debtor.

No. 02–07233–8C1.

United States Bankruptcy Court,
M.D. Florida,
Tampa Division.

July 24, 2003.

Robert A. Soriano, Esquire, Tampa, FL, for debtor.

John J. Lamoureux, Esquire, Hywel Leonard, Esquire, Tampa, FL, for Anchor Glass.

Lori V. Vaughan, Esquire, Tampa, FL, for Encore Glass, Inc.

*ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT FILED BY DEBTOR, ANCHOR GLASS CONTAINER CORPORATION, AND BY CLAIMANT, ENCORE GLASS, INC.*

C. TIMOTHY CORCORAN, III, Bankruptcy Judge.

This contested matter came on for consideration of a Motion for Partial Summary Judgment on Debtor's Objection to Claim No. 253 of Encore Glass, Inc., filed by Encore Glass, Inc. ("Encore's Motion for Summary Judgment") (Document No. 1083), and a Motion for Summary Judgment and Opposition to Encore's Pending Motion for Partial Summary Judgment (the "Anchor's Motion for Summary Judgment") (Document No. 1419) filed by Anchor Glass Container Corporation ("Anchor").

The summary judgment record before the court consists of the proof of claim of Encore Glass, Inc.—Claim No. 253 (the "Claim") (Claim Register No. 253), Anchor's Objection to Encore's Proof of Claim No. 253 (the "Objection") (Document No. 262F), an amended proof of claim of Encore Glass, Inc.—Claim No. 253.1 (the "Amended Claim") (Claim Register No. 253.1), an affidavit of Richard Evans ("Evans Affidavit") (Document No. 1084), an affidavit of John First ("First Affidavit"), a joint stipulation as to undisputed facts in connection with debtor's objection to proof of Claim No. 253 (the "Stipulation") (Document No. 1415), Anchor's own Motion for Summary Judgment and Opposition to Encore's pending Motion For Summary Judgment with an accompanying appendix (the "Anchor Motion for Summary Judgment") (Document No. 1420), and Encore's Memorandum in Response to Anchor's Motion for Summary Judgment (Document No. 1425).

The court has reviewed the record and considered the written argument and authorities presented by the parties. The granting of summary judgment is controlled by F.R.B.P. 7056, which adopts F.R.Civ.P. 56. F.R.Civ.P. 56(c) provides that summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that

there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." "There is no genuine issue for trial where the record could not lead a rational trier of fact to find for the non-moving party." *Twiss v. Kury,* 25 F.3d, 1551, 1554 (11th Cir.1994). "The party seeking summary judgment bears the burden of demonstrating that no genuine dispute exists as to any material fact in the case." *Id.* The court is required to consider the evidence in the light most favorable to the non-moving party. *Currie v. Cayman Resources Corp.,* 835 F.2d 780, 783 (11th Cir.1988).

## I.

The summary judgment record reveals the following undisputed facts:

Encore, Anchor, and Consumer Packaging, Inc., d/b/a Consumer Glass ("CPI") had a contractual relationship dating from 1996. CPI is a Canadian corporation that used to be Anchor's parent corporation. Under this arrangement, Anchor and CPI supplied Encore with glass bottles of a specific type and quality for the California wine industry. Encore's customers were well-known vintners in the Napa and Sonoma regions of California. These contractual relationships can be summarized as follows:

In November 1996, Encore (then known as CGC/Encore, Inc.) and CPI executed a Volume Purchase Agreement, effective from January 1, 1997, to December 31, 1999 ("1996 Agreement"). Pursuant to the 1996 Agreement, the rebate/discount schedule listed rebates ranging from 1 percent to 2.5 percent depending on year of production and volume. The 1996 Agreement was silent about the location for production of product. CPI subcontracted much of that production to Owens Illinois ("Owens"), and the subcontract arrangements between CPI and Owens remained in place for most, if not all, of 1999. In addition, under the 1996 Agreement, the agreed procedure was that Encore would simply submit a purchase order to CPI to trigger CPI's responsibility to produce product.

On May 21, 1998, Anchor and Encore (but not CPI) entered into a Volume Purchase Agreement (the "Agreement") that was to become effective January 1, 2000, and that would supercede the 1996 Agreement once it expired. Again, this Agreement was silent about the location of the plant or plants to be used to produce wine bottles for Encore. The rebate discount schedule in the Agreement ranged from 1 percent to 2.5 percent. The Agreement also included a provision requiring that the manufacturer had to accept a purchase order before the obligation to produce would arise. The Agreement did not require Encore to purchase a minimum quantity of bottles.

On or about June 24, 1999, Encore, CPI, and Anchor executed an Amended and Restated Volume Purchase Agreement (the "Amended Agreement"), to become effective as of January 1, 2000. Pursuant to the Amended Agreement, Encore was to be supplied with wine bottles produced by CPI. In turn, Encore sold these bottles to different vintners. In that Amended Agreement, the parties specifically designated CPI's plant in Lavington, British Columbia, Canada ("Lavington plant"), as the place of production for the wine bottles. Substantial upgrades were required to be made at the Lavington plant to permit the production of bottles of sufficient quality that would satisfy Encore's customers.

In addition, a more generous rebate and discount schedule was agreed. The Amended Agreement called for volume rebates (between 2 percent to 7 percent) to

be paid to Encore based upon the year of production and the volume of bottles sold to Encore from CPI's Lavington plant.

The Amended Agreement did not require Encore to purchase a minimum quantity of bottles. Instead, it provided that "Buyer will purchase from Seller and Seller will sell to Buyer certain glass containers and services such as container decorating and similar items on an ongoing basis." (Amended Agreement, Recitals, ¶ C). The Amended Agreement called for Encore "to issue purchase orders to Seller from time to time." The terms of the Amended Agreement were to be incorporated into these purchase orders. (Amended Agreement, ¶ 2).

In May 2001, CPI filed for bankruptcy under Canadian law (the "CPI Bankruptcy"). In the course of CPI's bankruptcy proceedings, CPI's Lavington plant was sold to Owens, a competitor of CPI. In addition, CPI rejected the Amended Agreement. Consequently, Owens did not assume CPI's obligation under the Amended Agreement, and Owens has refused to honor CPI's Amended Agreement with Encore. After October 12, 2001, Encore submitted no further purchase orders under the Amended Agreement.

Following the sale of CPI's Lavington plant and the rejection of the Amended Agreement by CPI, Encore turned to one of its other existing suppliers of wine bottles, Vitro Packing, Inc. ("Vitro"), to produce the additional bottles that Encore needed for its customers. According to Encore, however, the volume rebates and discounts provided by Vitro are less than those payable under the Amended Agreement. Encore's claim is to recover the "spread" between the Vitro rebates and discounts and the larger rebates and discounts contained in the Amended Agreement.

On April 15, 2002, Anchor filed its voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code. On August 8, 2002, the court confirmed Anchor's Amended Plan of Reorganization. On or about May 23, 2002, Encore timely filed its proof of claim, which it subsequently amended on January 30, 2003, asserting an unsecured claim for $6,838,904.59. On July 19, 2002, the debtor filed its objection, objecting to the claim on several grounds.

## II.

Granting summary judgment in Anchor's favor is appropriate on two separate grounds. First, the Amended Agreement is an unenforceable indefinite quantity supply contract. Second, performance is now impossible and performance is excused because the Amended Agreement required that production occur at the Lavington plant.

## A.

■ Supply contracts fall into one of three categories: definite quantity, indefinite quantity, and requirements. *Mason v. United States*, 222 Ct.Cl. 436, 615 F.2d 1343, 1347 (1980). When a supply contract is ambiguous as to type, courts should examine extrinsic evidence to determine the type of supply contract the parties intended. *See Zemco Manufacturing., Inc. v. Navistar International Transportation Corp.*, 186 F.3d 815, 818 (7th Cir. 1999). Courts should also look to the course of dealing between the parties and the trade norms to determine what type of contract was intended. *Id.*, UCC § 2–208. The basic elements of each of these three kinds of contract are described below.

1. *Definite Quantity Supply Contract.*

■ A definite quantity supply contract is exactly what it sounds like—a contract

for the buyer to buy a specific amount of product for a specific amount of money. The Amended Agreement did not state a specific quantity of bottles that Encore would purchase from CPI. The Amended Agreement, therefore, is not a definite quantity supply contract.

### 2. *Requirements Supply Contract* [1].

■ A requirements contract has very specific elements, and all must be present for the contract to be valid:

> [A] requirements contract exists only when the contract (1) obligates the buyer to buy goods, (2) obligates the buyer to buy goods exclusively from the seller, and (3) obligates the buyer to buy all of its requirements for goods of a particular kind from the seller.

*Zemco Manufacturing*, 186 F.3d at 817, *citing* James J. White & Robert S. Summers, *Uniform Commercial Code* § 3–9, at 154–55 (1995); *see also* E. Allan Farnsworth, *Farnsworth on Contracts*, § 2–15, at 135–37 (1990).

None of these elements of a requirements supply contract are present in this case. First, Encore was not required to buy from CPI. Rather, at its discretion, Encore simply placed orders for wine bottles that were accepted. Second, Encore was not required to buy goods exclusively from CPI. The Amended Agreement is silent on this element, and Encore readily admits that CPI was not its exclusive supplier. Third, Encore was not required to buy all its particular product requirements

from CPI, a point also readily conceded by Encore. (The Evans Affidavit at ¶ 11 explains that Encore split its business between Vitro and CPI.) *See Dixie Oil Company of Alabama, Inc. v. Texas City Refining, Inc.*, 362 F.Supp. 733, 734 (S.D.Miss.1973) [action by buyer to enforce agreement to buy and sell gasoline was unenforceable contract because buyer had a right to terminate agreement at any time, had a right to determine how much it would order from seller, and admitted it did not buy exclusively from seller, so that relationship was a "one-way street"]; *Propane Industrial, Inc. v. General Motors Corp.*, 429 F.Supp. 214, 221 (W.D.Mo.1977) [purchase order for gasoline was unenforceable contract because defendant did not explicitly or implicitly bind itself to purchase exclusively from plaintiff].

Moreover, there is nothing in the Amended Agreement requiring Encore to purchase all of its requirements from CPI or to buy exclusively from CPI. In fact, Encore could have taken some or all of its business elsewhere at any time. In that event, neither CPI nor Anchor would have had any remedy had Encore determined to enter into an exclusive requirements contract with another supplier or to move more of its business to another supplier.

For these reasons, The Amended Agreement is not a requirements contract.

### 3. *Indefinite Quantity Supply Contract.*

■ An indefinite quantity supply contract requires a minimum quantity

---

**1.** Requirements contracts are governed by UCC § 2–306, *Output, Requirements and Exclusive Dealings:*

> (1) A term which measures the quantity by the output of the seller or the requirements of the buyer means such actual output or requirements as may occur in good faith, except that no quantity unreasonably disproportionate to any stated estimate or in the absence of a stated estimate to any

normal or otherwise comparable prior output or requirements may be tendered or demanded.

> (2) A lawful agreement by either the seller or the buyer for exclusive dealing in the kind of goods concerned imposes unless otherwise agreed an obligation by the seller to use best efforts to supply the goods and by the buyer to use best efforts to promote their sale.

term to be stated in the contract. Absent a minimum quantity term, an indefinite quantity supply contact is an illusory and unenforceable contract. *See Willard, Sutherland & Co. v. United States,* 262 U.S. 489, 494, 43 S.Ct. 592, 67 L.Ed. 1086 (1923) [indefinite quantity contract without quantity term is illusory and unenforceable until actual performance]; *Coyle's Pest Control, Inc. v. Cuomo,* 154 F.3d 1302, 1305 (Fed.Cir.1998) [indefinite quantity contract unenforceable without minimum quantity term]; *Mason,* 615 F.2d at 1347 [guaranteed minimum quantity required to enforce indefinite quantity contract]; *Howell v. United States,* 51 Fed.Cl. 516, 523 (Fed.Cl.2002) [indefinite quantity contract for mowing services enforceable because there is ascertainable minimum quantity]; *Rice Lake Contracting, Inc. v. United States,* 33 Fed.Cl. 144, 155 (Fed.Cl. 1995) [government maintenance contract was indefinite quantity contract].

As the court wrote in *Mason,* 615 F.2d at 1345, fn. 5, *citing Willard, Sutherland,* 262 U.S. at 493, 43 S.Ct. 592, and 1A Corbin, *Contracts* § 157 (1963 & Supp. 1971):

> An indefinite quantities contract is a contract under which the buyer agrees to purchase and the seller agrees to supply whatever quantity of goods the buyer chooses to purchase from the seller. It differs from a requirements contract in that under a requirements contract the buyer agrees to purchase all his requirements from the seller. Under an indefinite quantities contract, even if the buyer has requirements, he is not obligated to purchase from the seller. In an indefinite quantities contract, without more, the buyer's promise is illusory and the contract unenforceable against the seller.

The Amended Agreement here is a classic indefinite quantity supply contract. Encore had to place a purchase order, and seller then had to "accept" it. There is no requirement for Encore to purchase a minimum quantity of goods.

For these reasons, the court concludes the Amended Agreement is an indefinite supply agreement that is unenforceable.

### B.

■ As a separate and additional basis, the court also grants summary judgment in Anchor's favor because performance under the Amended Agreement was rendered impossible when CPI sold its Lavington plant.

■ In *Opera Co. of Boston, Inc. v. Wolf Trap Foundation for the Performing Arts,* 817 F.2d 1094, 1102 (4th Cir.1987), the court stated the elements necessary to establish the defense of impossibility of performance:

> [A] party relying on the defense of impossibility of performance must establish (1) the unexpected occurrence of an intervening act, (2) such occurrence was of such a character that its non-occurrence was a basic assumption of the parties, and (3) that occurrence made performance impossible.

The enhanced rebates and discounts under the Amended Agreement were premised upon continual production of product at CPI's Lavington plant. The Amended Agreement states: "The parties contemplate that the product *shall* be manufactured at CPI's Lavington facility." (Amended Agreement, Recital ¶ D) (Emphasis added). Indeed, Encore had great confidence in the quality of bottles produced at the Lavington plant. (Evans Affidavit) ["the manufacturer must be able to pass certain quality runs to certify that a specific plant is able to produce containers of the specific color, design, and quality desired * * * * [and] the Lavington plant was capable of producing the quality of

glass containers to meet Encore's needs and ... passed the necessary quality runs."]

The Lavington plant was sold to Owens as part of CPI's bankruptcy proceedings. Owens would not honor the Amended Agreement. CPI's production of bottles at the Lavington plant was an integral term of the Amended Agreement.

Seeking to avoid the clear statement in the Amended Agreement that product for Encore would be produced at Lavington, Encore argues that the Amended Agreement did not restrict production to the Lavington plant and even contemplated Anchor might supply Encore with wine bottles from other plants. To support this proposition, Encore cites to paragraph 31 of the Amended Agreement. This provision states: "In the event that Anchor or CPI builds or acquires a glass container manufacturing facility capable of producing products in a location closer to Richmond, California than the Lavington facility, then CPI or Anchor shall undertake to supply products to buyer from such facility, with Buyer's prior written approval."

Encore does not suggest, however, that either CPI or Anchor did in fact "build or acquire" another facility closer to Encore's base in Richmond, California. Even had CPI or Anchor done so, they could not have used that facility to supply Encore unless Encore first gave its approval. Indeed, undercutting its position further, Encore qualifies its own argument by stating that Encore would first have to "qualify" any alternative site—other than the Lavington plant—to Encore's satisfaction. (Encore's Motion for Summary Judgment, p. 7). Accordingly, paragraph 31 of the Amended Agreement does not assist Encore in avoiding the conclusion that the loss of the Lavington plant renders performance impossible.

The sale of the Lavington plant and Owens subsequent refusal to honor the Amended Agreement made CPI's performance under the Amended Agreement impossible. Owens now controls production at the Lavington plant.

Anchor has therefore established the defense of impossibility of performance, and its performance of the Amended Agreement is excused.

### III.

Accordingly, the Court orders as follows:

1 Encore's Motion for Partial Summary Judgment is denied.

2. Anchor's Motion for Summary Judgment is granted.

3. By separate notice, the court will schedule a further preliminary pretrial and scheduling conference to discuss with counsel what, if any, issues remain for determination to permit the court to enter a final order on the Anchor objection to the Encore claim.