# Order

**Michigan Supreme Court**
**Lansing, Michigan**

November 26, 2014

147860

Robert P. Young, Jr.,
Chief Justice

Michael F. Cavanagh
Stephen J. Markman
Mary Beth Kelly
Brian K. Zahra
Bridget M. McCormack
David F. Viviano,
Justices

THE SERVICE SOURCE, INC. and THE
SERVICE SOURCE FRANCHISE, LLC,
　　　　　Plaintiffs-Appellees,

v

DHL EXPRESS (USA), INC.,
　　　　　Defendant-Appellant.

SC: 147860
COA: 301013
Lenawee CC: 09-003258-CK

_____/

　　　　On order of the Court, leave to appeal having been granted and the briefs and oral arguments of the parties having been considered by the Court, we VACATE our order of May 23, 2014. The application for leave to appeal the July 11, 2013 judgment of the Court of Appeals is DENIED, because we are no longer persuaded that the questions presented should be reviewed by this Court.

　　　　MARKMAN, J. (*dissenting*).

　　　　Because I believe that the trial court clearly erred when it awarded plaintiff damages for profits that it lost *before* the contract was *breached* on January 31, 2009, as well as profits that it lost *after* the contract was lawfully *terminated* on March 5, 2009, I respectfully dissent from this Court's order denying leave to appeal.

　　　　The two corporate parties entered into a contract in which defendant would provide international and domestic shipping services for plaintiff's customers and, in return, plaintiff would promote defendant as a preferred carrier to its customers. Facing difficult economic circumstances, defendant informed plaintiff on November 10, 2008 of its plans to discontinue providing domestic shipping services on January 31, 2009. Plaintiff made its last payment to defendant on December 2, 2009. Although defendant continued to provide domestic services until January 31, 2009, and international services until March 5, 2009, plaintiff never paid defendant for these services. Paragraph 17 of the contract gave defendant the power to terminate the contract for non-payment upon 10 days' notice. In response to plaintiff's non-payment, defendant gave the required notice and terminated the contract effective March 5, 2009. Plaintiff then filed this action for breach of contract on February 10, 2009, after defendant ceased providing domestic services.

　　　　The trial court awarded plaintiff damages in the amount of $3,546,789, which represented the amount of profits plaintiff lost between January 1, 2009, and December 31, 2012, less the money that plaintiff owed defendant. However, given that plaintiff

itself concedes that defendant did not actually breach the contract until January 31, 2009, any lost profits plaintiff suffered before this date cannot be said to have been caused by defendant's breach. *Miller-Davis Co v Ahrens Constr, Inc*, 495 Mich 161, 178 (2014) ("A party asserting a breach of contract must establish by a preponderance of the evidence that (1) there was a contract (2) which the other party breached (3) thereby resulting in damages to the party claiming breach."). In addition, given that defendant lawfully terminated the contract on March 5, 2009, defendant's liability under the contract could not extend beyond this date. *Wilkie v Auto-Owners Ins Co*, 469 Mich 41, 51 (2003) ("[T]he bedrock principle of American contract law [is] that parties are free to contract as they see fit, and the courts are to enforce the agreement as written absent some highly unusual circumstance. . . ."). Therefore, to the extent that the trial court awarded damages for profits lost *before* the contract was breached (assuming for the sake of argument that the contract was breached at all, a matter that I would also review further were this Court to grant leave), and for profits lost *after* the contract was lawfully terminated, the trial court clearly erred, in my judgment. A corrected calculation of plaintiff's lost profits from January 31, 2009, through March 5, 2009, would reduce the award of damages by roughly $3.3 million.

In light of this error, I would vacate the trial court's award of damages to the extent that it includes damages for profits lost before January 31, 2009, and after March 5, 2009. The parties here are sophisticated business entities and freely constructed the agreement that governed their relationship, and when parties enter into such agreements, they do so with the expectation that courts will accurately enforce their terms. At least with respect to the award of damages, I do not believe that this occurred in this case.

ZAHRA, J. (*dissenting*).

This case concerns the fallout from the decision of defendant, DHL Express (USA), Inc., to pull out of the United States domestic shipping business. Defendant has long been involved in international shipping. In 2003, defendant entered the domestic shipping market by acquiring Airborne Express, a domestic shipper. As part of the acquisition, defendant assumed Airborne Express's agreements with other companies known as "resellers." Resellers obtain preferential wholesale rates with shipping companies and resell the shipping services to smaller customers at rates in between the wholesale rate and the retail rate that would otherwise be charged by the shipper. One of those resellers, plaintiff The Service Source, Inc. (TSS), was a reseller for Airborne Express and operating under a 5-year "Reseller Agreement for U.S. Origin Domestic and International Service."

After DHL acquired Airborne Express, TSS and defendant, on January 6, 2006, entered into a 5-year "Reseller Agreement for U.S. Origin Domestic and International Service." Except for the dates and parties, this agreement was the same as the 5-year "Reseller Agreement for U.S. Origin Domestic and International Service" between

Airborne Express and TSS. TSS and defendant renewed this reseller agreement in November 2006 and December 2007, each time extending the 5-year agreement an additional year. In 2007, the owners of TSS incorporated plaintiff The Service Source Franchise, LLC (TSSF), to expand and franchise its reseller operations. On July 22, 2007, defendant and TSSF entered into a 5-year "Reseller Agreement for U.S. Domestic Origin and International Service," which except for the dates and parties, had the same terms as the reseller agreement with TSS bearing the same name.[1]

The two reseller agreements, which are in relevant part identical, provide the following pertinent recitals on page 1:

## RESELLER AGREEMENT
## FOR U.S. ORIGIN DOMESTIC AND INTERNATIONAL SERVICE

\* \* \*

### RECITALS:

**WHEREAS**, RESELLER has requirements for expedited international air express services for documents and/or packages or freight being sent to various locations around the world and for domestic door-to-door air and ground express services for documents and/or packages or freight being sent to various locations throughout the United States ("Services"); and

**WHEREAS**, DHL regularly provides such Services for its customers and desires to handle substantially all the requirements of customers of RESELLER ("RESELLER customers") for such Services to the locations served by DHL in accordance with the terms and conditions contained herein; and

**WHEREAS**, RESELLER's agreement to consign a certain amount of its requirements for such service to DHL will result in cost savings and decreased operational expenses to DHL due to the minimum volumes expected; and

**WHEREAS**, as a result of said cost savings and expense reduction, DHL agrees to provide Services at the rates specified herein.

The reseller agreements then provide:

### AGREEMENT:

---

[1] Plaintiff TSS and plaintiff TSSF will hereafter generally be referred to collectively as "plaintiff."

1. **THE SERVICES.**

RESELLER agrees to promote DHL's Services to RESELLER customers, and DHL agrees to provide Services to RESELLER customers to fulfill RESELLER customers' needs for Services. RESELLER shall promote DHL's Services as a preferred carrier to RESELLER customers for international and domestic shipments of documents and small packages. Shipments will originate at RESELLER customers' domestic locations at which DHL regularly provides collection service with its own personnel and will be delivered to any destination regularly serviced by DHL or its designated agents. . . .

DHL may, at its discretion, add additional services to this Agreement from time to time, under terms and conditions to be determined.

Paragraph 16 of the reseller agreements provides in part:

DHL will invoice RESELLER on a weekly basis for the Services provided by DHL to RESELLER customers during the previous week. Invoiced amounts will be remitted by RESELLER to DHL within twenty-one (21) days of invoice date. RESELLER's account will be considered past due twenty-one (21) days after invoice date. A late payment fee of 5% or $5.00, whichever is greater, will be assessed upon past due balances.

Paragraph 17 of the agreements relates to the term of agreement and termination. It provides in part:

(a) This Agreement shall become effective on the date set forth above and shall remain in full force and effect for five (5) years, unless sooner terminated in accordance with the provisions of this Agreement. By mutual consent, to be embodied in writing no later than December 1 of each calendar year, this Agreement may be extended for an additional one (1) year period(s) so that it will have a rolling five (5) year term. For example, by December 1, 2006, the parties may agree in writing to extend the Agreement for an additional year, i.e., until January 6, 2012. By December 1, 2007, the parties may agree in writing to extend the Agreement for an additional year; i.e., until January 6, 2013.

(b) If either party defaults in any obligation or covenant of this Agreement, and continues in default for a period of thirty (30) days after receiving notice of default from the non-defaulting party, the non-defaulting party may, without prejudice to other rights and remedies, terminate this Agreement upon thirty (30) days written notice.

(c) Notwithstanding sub-sections (a) and (b) above, in the event of RESELLER'S nonpayment of any bill or other charge when past due and

not reasonably contested by RESELLER, DHL may terminate this Agreement upon ten (10) days written notice.[2]

As mentioned, defendant decided to withdraw from the domestic shipping market and provide only international shipping service. On November 10, 2008, defendant issued a press release stating that domestic service would end January 30, 2009, and that it could no longer guarantee specific delivery dates for domestic packages as of November 18, 2008. Ninety percent of plaintiff's resale shipping was domestic.

On February 10, 2009, plaintiff filed this suit, alleging that defendant's announcement on November 10, 2008, "breached said Agreements, and [defendant] has since that time refused to honor its obligations under the Agreements." Plaintiff continued to use defendant's domestic shipping services through January 2009, and international shipping services for the next few months. Plaintiff also stopped paying defendant for services still being used, with the last payment made on December 2, 2008. By late February 2009, defendant claimed that plaintiff owed it more than $500,000. As a result, defendant sent a letter to plaintiff informing plaintiff that the reseller agreements were terminated as of March 5, 2009, under ¶ 17(c) of the agreements.

Defendant filed a counterclaim asserting that plaintiff owed it more than $500,000. Plaintiff did not contest the counterclaim and conceded that it owed defendant $673,000 for unpaid shipping services.

Plaintiff moved for partial summary disposition on the question of liability. The circuit court did not address the specific language of the reseller agreements, relying instead on the parties' course of dealing. The court held:

> Counsel, this is a contract case. There's a contract commencing January of '06. I think it was later affirmed sometime maybe in '07, and then maybe again in '08. But it provided for and in fact did include domestic and international delivery service. Commencing sometime in the end of '08 Defendants ceased and altered the terms of the practice and the contract that was in existence at that time.
>
> I think that there are probably all kinds of ways to shade the facts here. Bottom line is there is going to be a litany of damages if they exist or not, but as far as the fact of, both of you agree, that you no longer -- the

---

[2] Notably, ¶ 28 of the reseller agreements provides for "**GOVERNING LAW**," stating that "[t]his Agreement shall be governed by and construed in accordance with the laws of Florida without regard to its conflict of law rules." This provision is not pertinent here given the parties agreement that Michigan and Florida law is the same in regard to this case.

Defendant no longer provides the same services that were provided to the Plaintiff at the time that the contract was entered into and that was in fact the practice between the parties for all that time up until such time as Defendant ceased providing that for Plaintiffs and Plaintiffs' clients received their packages back undelivered contrary to the terms of the contract.

I don't find it that far reaching, I don't find it as complicated as Defendants would like to see it, and I think all the arguments that go to the corpus of Defendant's position here remain in tact [sic] under the issue of damages. I am granting Plaintiffs' motion for partial summary judgment and allowing the matter to go forward on the issue of damages.

In essence, the circuit court held that the reseller agreements required defendant to provide domestic service. Because there was no dispute that defendant ceased domestic service in January 2009, the court granted plaintiff's motion on the issue of liability.

The Court of Appeals took a different approach and addressed the specific language of the reseller agreements:

As defendant argues, one sentence of the contract suggests that defendant was free to cease service to any location if it so chose: "Shipments will originate at RESELLER customers' domestic locations at which DHL regularly provides collection service with its own personnel and will be delivered to any destination regularly serviced by DHL or its designated agents." This suggests that if DHL ceased regular service in any given area, it would no longer be required to collect or deliver there for plaintiff[]. If one were to consider only this sentence, it would appear that defendant's argument is correct that it was not bound to pick up or deliver packages at any domestic location.

The panel held the following:

However, a contract must be read as a whole, and "isolated words and phrases are not determinative of the parties' intentions." *City Nat'l Bank of Miami v Citibank, NA*, 373 So 2d 703 (Fla Dist Ct App, 1979); see also *Royal Prop Group, LLC v Prime Ins Syndicate, Inc*, 267 Mich App 708, 719; 706 NW2d 426 (2005) ("This Court is required to read contracts as a whole, giving harmonious effect, if possible, to each word and phrase."). Taken as a whole, the contracts between the parties clearly contemplate that defendant would provide domestic service. The contracts are titled "Reseller Agreement for U.S. Origin Domestic and International Service." The agreements require defendant to provide "services" to plaintiffs' customers, and defines services as "expedited international air express services . . . *and for domestic door-to-door air and ground express*

*services* for documents and/or packages or freight being sent to various locations throughout the United States." (Emphasis added.) Further, every reference to shipping refers to both international and domestic service. There is no indication that the parties intended to allow DHL to completely cease either domestic or international service. Reading the contracts as a whole and giving meaning to all of the words in the contract, defendant could likely cease service to a handful of specific domestic locations without breaching the contract, but could not completely stop all domestic service.[3]

In my view, the provisions relied on by the Court of Appeals do not address the volume of services defendant must legally provide to plaintiff's customers under the reseller agreements. The complete title of the reseller agreements is not germane to this question, and the definition of "services" under the agreements is simply not in dispute. Rather than addressing the question whether the reseller agreements provide for the volume of services defendant must provide, the panel simply read into the agreements a vague fiat that defendant's cessation of domestic service to a "handful" of locations would be just fine.[4] Of course, this conclusion only raises the question whether it then is permissible for defendant to cease service to "two handfuls" of the locations, or perhaps 20% or even 60% of the locations. In other words, the panel here improperly assumed that closing a "handful" of locations is permissible despite that the language of the reseller agreements it relied on does not provide a sufficient basis for determining whether defendant's cessation of any volume of services constitutes a breach of the agreements.

Rather, the only provision that does address the amount of services defendant must provide is contained in the recitals, which in part state that "DHL regularly provides such Services for its customers and desires to handle substantially all the requirements of customers of RESELLER ("RESELLER customers") for such Services to the locations served by DHL in accordance with the terms and conditions contained herein[.]" While this provision clearly states defendant's intent to "handle substantially all the requirements of [plaintiff's] customers," the provision also makes clear that defendant's obligation is limited to providing services "to the locations served by DHL in accordance with the terms and conditions contained herein[.]" And the only provision in the reseller agreements addressing the locations served by defendant provides that "[s]hipments will

---

[3] *Service Source, Inc v DHL Express (USA), Inc*, unpublished opinion per curiam of the Court of Appeals, issued July 11, 2013 (Docket No. 301013), p 5.

[4] Indeed, the uncertainly of the panel's conclusion is reflected in its listless statement that "defendant *could likely* cease service to a handful of specific domestic locations without breaching the contract, but could not completely stop all domestic service." *Id.* (emphasis added).

originate at RESELLER customers' domestic locations at which DHL regularly provides collection service with its own personnel and will be delivered to any destination regularly serviced by DHL or its designated agents." Reading this provision and the recital together, I find it rather plain that defendant is obligated to provide services to plaintiff's customers at locations regularly serviced by defendant. As such, defendant owes no legal duty to plaintiff to maintain regular service to all or any of its locations. Rather, I agree with defendant that this language "means that [defendant] agreed that whatever infrastructure it had in place to pick up and deliver packages to any particular location would be available at a discount to [plaintiff's] customers—nothing more and nothing less."

This position is also consistent with other express provisions of the reseller agreements. For instance, the agreements do not require plaintiff to pay for services in advance. Paragraph 16 of the reseller agreements states that defendant would bill plaintiff on a weekly basis for the services provided by defendant to plaintiff's customers during the previous week. Had the services been purchased in advance, that would be an indication that plaintiff was expecting that the delivery services would be available for the length of the reseller agreements. Further, neither party to the contract is required to deal exclusively with the other party. That is, defendant may do business with other resellers and plaintiff may do business with other shippers. In my view, these provisions of the reseller agreements reflect that plaintiff could not reasonably rely on future services from defendant. Rather, as defendant posits in reply to plaintiff's brief on appeal, "[i]f [defendant] was not obligated to satisfy [plaintiff's] requirements, and if [plaintiff] had no obligation to ship with [defendant], then it makes no sense to interpret the contract as locking [defendant] into an entire domestic delivery network just for [plaintiff's] benefit."

In its brief to this Court, plaintiff notes that "[t]here is also no argument that the contract is unenforceable due to an indefinite quantity, see *In re Anchor Glass Container Corp*, 297 BR 887, 891 ([Bankr] MD Fla, 2003), because [plaintiff] committed to a $4 million minimum annual volume." I find this assertion to be inaccurate. Paragraph 21 provides only that

> [t]he discounted rates presented are in expectation of minimum monthly payments by [plaintiff] to DHL for Services of three hundred and twenty eight thousand dollars ($328,000). If such expectations are not met, DHL may elect in its discretion to adjust rates under this Agreement accordingly or to terminate this Agreement.

Paragraph 21 does not at all reflect that plaintiff committed to a $4 million minimum annual volume. Indeed, plaintiff could unilaterally decide not to ship with defendant and, according to ¶ 21, defendant could only "elect in its discretion to adjust rates under this Agreement accordingly or to terminate this Agreement."

Last, I find *Anchor Glass* instructive. That case is concisely summarized in 30 Williston, Contracts (4th ed), § 77:2, pp 288-289:

> The agreement was an indefinite quantity supply agreement. Under the parties' arrangement, the buyer was neither obligated to buy glass bottles for use in bottling wine exclusively from the seller, a now bankrupt bottle manufacturer, nor did the agreement mandate that the manufacturer had to satisfy all of the buyer's requirements for bottles. Rather, the buyer was free, when it wanted to purchase bottles, to send the seller a purchase order, which the seller could—and presumably would—fill, promising only that it would provide the buyer with certain discounts and rebates if and when it bought from the seller. However, the buyer conceded that it did not have to buy exclusively from this manufacturer and that it did not do so; and that it was not obligated to buy its requirements, or any specified quantity, from the manufacturer. In short, when the buyer filed its claim against the manufacturer in the latter's bankruptcy, the court determined that this was not an agreement to do anything else than engage in some business when a need arose, and to the extent that each party was capable or desirous of doing business with the other at the time."

As in *Anchor Glass*, plaintiff was not obligated to buy shipping services exclusively from defendant, nor did the agreement mandate that defendant had to satisfy all of plaintiff's requirements for shipping. Rather, plaintiff was free, when it wanted to purchase shipping, to send defendant a purchase order, which defendant could—and presumably would—fill, promising only that it would provide plaintiff certain discounts and rebates if and when plaintiff bought from defendant. However, plaintiff conceded that it did not have to buy exclusively from defendant and that it was not obligated to buy its requirements, or any specified quantity, from defendant. Similarly, this was not an agreement to do anything other than engage in some business when a need arose and to the extent that each party was capable or desirous of doing business with the other at the time. Thus, I agree with defendant that the reseller agreements merely provide that defendant "agreed that whatever infrastructure it had in place to pick up and deliver packages to any particular location would be available at a discount to [plaintiff's] customers—nothing more and nothing less." There is simply no language in the agreements imposing a legal duty on defendant to continue domestic shipping service to

plaintiff at a certain volume. Accordingly, I conclude that defendant did not breach any provision of the reseller agreements, and would reverse the lower courts' decisions and remand for entry of summary disposition for defendant.



I, Larry S. Royster, Clerk of the Michigan Supreme Court, certify that the foregoing is a true and complete copy of the order entered at the direction of the Court.

November 26, 2014



Clerk

t1125